**STATE of Missouri, Respondent,**

v.

**Henry B. TATUM, Appellant.**

**No. WD 43673.**

Missouri Court of Appeals,
Western District.

Nov. 26, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 28, 1992.

Application to Transfer Denied
March 24, 1992.

**24**

Bruce R. Anderson, Asst. Appellate Defender, Kansas City, for appellant.

William L. Webster, Atty. Gen., Millie Aulbur, Asst. Atty. Gen., Jefferson City, for respondent.

Before LOWENSTEIN, C.J., SHANGLER and TURNAGE, JJ.

TURNAGE, Judge.

Henry Tatum was found guilty by a jury of one count of first degree murder, § 565.-020, RSMo Cum.Supp.1990, one count of second degree murder, § 565.021, RSMo 1986,[1] and two counts of armed criminal action, § 571.015. Tatum was sentenced to life imprisonment without the possibility of parole on the first degree murder charge, 30 years imprisonment on the second degree murder charge to be served consecutive to the sentence for first degree murder, and 10 years on each of the armed criminal action charges with the sentences to be served concurrently with the other sentences. Tatum contends the court erred in failing to submit his proffered instructions on second degree murder and voluntary and involuntary manslaughter, in accepting the verdict because the jury poll revealed that one juror did not agree with the verdict, in overruling an objection to a portion of the prosecutor's argument, in allowing evidence of other crimes, and in refusing to declare a mistrial. Affirmed.

Tatum and Marcia Rainey began living together in a rent subsidized apartment which was rented in the name of Marcia. Despite the rules governing the apartment house which forbade a man living in the Rainey apartment, Rainey allowed Tatum to move in and live there. Rainey had a two-year old daughter, Whitney, who lived with Rainey and Tatum. In May, 1989, Rainey's feeling toward Tatum had cooled and she began seeing Ronald Cobbins. On May 4, Tatum planned to go out for the evening and left the apartment without telling Marcia where he was going. Unknown to Tatum, Marcia had a date with Cobbins that night.

About three o'clock the next morning Tatum returned to the apartment building. He looked at the windows of the Rainey apartment and noted no lights. He suspected that Marcia was in bed with a man. Because of the rules governing the building, Tatum did not have a key to unlock the front security door or the apartment door. However, when he arrived he found the front security door had been propped open with a rock. Tatum entered the building and knocked on Rainey's door but there was no answer. Tatum went to the landing between the first and second floors and climbed onto a balcony from which he was able to reach and enter a window into the Rainey apartment. Marcia had heard the noise when Tatum broke through the screen to enter the apartment and went into the room to investigate. When she confronted Tatum she told him that he had to get out because she had called the police. Tatum replied "that nigger's in here and I'm going to kill him."

Tatum had removed a gun from under the mattress of the bed the day before and placed it between the cushions of the couch in the living room. After he told Marcia what he was going to do he went to the couch and removed the gun. Marcia could not clearly see Tatum but heard him cock the gun twice. Marcia again told Tatum that he had to get out because she had called the police. Tatum pointed the gun at Marcia and told her to get out of the way

1. All sectional references are to RSMo 1986, unless otherwise indicated.

or he would kill her. When Marcia attempted to wrestle the gun from Tatum he knocked her aside and knocked over a table and ran to the bedroom door. Tatum kicked in the door and began shooting. Tatum fired about five shots into the bedroom. As soon as the shooting started Cobbins yelled to stop shooting him. When the shooting did stop Marcia ran into the bedroom and picked up Whitney, who was bleeding profusely, from the bed. Cobbins came out of the bedroom and picked up a knife and started toward Tatum but Tatum took the knife away and stabbed Cobbins five times.

Both Whitney and Cobbins died from the gunshot wounds inflicted by Tatum. Whitney had sustained four wounds with a bullet in her head below the ear being the cause of death. Cobbins also sustained four gunshot wounds with a bullet passing through the lower chest and severing the left renal artery being the cause of death. The stab wounds were not life threatening.

Tatum testified and admitted that he had done the shooting and that his purpose was to seriously injure or kill Cobbins.

Tatum first contends that the court erred in refusing to give his proffered second degree murder and voluntary manslaughter instructions in the submission of Count I for the murder of Cobbins. Tatum contends that the court should have submitted his instructions which would have allowed the jury to find him guilty of the lesser charges if the jury found that he acted out of sudden passion arising from adequate cause. Tatum points to his testimony that "he lost it" after Marcia told him to get out of the apartment because that indicated to him that another man was there. Tatum's instruction stated that "if you do not find the Defendant guilty of murder in the first degree, you must consider whether he is guilty of murder in the second degree." The offered manslaughter instructions contained similar language.

In *State v. Barnes*, 740 S.W.2d 340, 344[4] (Mo.App.1987), the jury was instructed on first and second degree murder but the court refused to give a proffered instruction on second degree murder which included a paragraph that the defendant acted under the influence of sudden passion arising from adequate cause. The court also refused to give a voluntary manslaughter instruction. The court stated that it was not necessary to consider the merits of the argument because the jury had found the defendant guilty of murder in the first degree and that deliberation is necessary to a finding of murder in the first degree. The court stated that "[d]eliberation is the antithesis of reaction to sudden passion." The court held that when the jury found the essential elements of first degree murder it was precluded from considering a lesser included offense. The court concluded that any error in the refusal to give lesser degree of homicide instructions was rendered nonprejudicial by a finding of guilt on the greater offense.

■ The same situation is present in this case. The jury found Tatum guilty of murder in the first degree for the death of Cobbins and, thereby, found that he acted with deliberation which is the antithesis of sudden passion. The jury would never have reached the instructions Tatum proposed because it had found him guilty of murder in the first degree. When he was found guilty of murder in the first degree, the refusal of the instructions offered by Tatum became nonprejudicial.

■ Tatum contends the court should have given an involuntary manslaughter instruction containing the sudden passion paragraph in the submission relating to the death of Whitney. The State submitted the death of Whitney under the transferred intent doctrine, § 565.003, which allows the jury to find the necessary culpable mental state for a homicide if the only difference between what actually occurred and what was the object of the offender's state of mind is that a different person was killed. Thus, the mental state of Tatum at the time that he shot and killed Cobbins is the mental state applicable to the killing of Whitney.

■ Tatum contends that he was entitled to have the jury instructed on sudden passion arising from adequate cause. Sudden

passion is defined in § 565.002(7) as "passion directly caused by and arising out of provocation by the victim or another acting with the victim which passion arises at the time of the offense and is not solely the result of former provocation...." Adequate cause is defined in § 565.002(1) "cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary persons capacity for self-control...." The burden was on Tatum to inject the issue of sudden passion arising from adequate cause. Section 565.023.2. In *State v. Simmons*, 751 S.W.2d 85, 91[4–7] (Mo.App.1988), the court stated:

> In order for an offense to be reduced to one less culpable, there must be a sudden, unexpected encounter or provocation tending to excite the passion beyond control. Passion may be rage or anger, or terror, but it must be so extreme that for the moment, the action is being directed by passion, not reason. (Quoting from R. Perkins, *Criminal Law*, 66 (1969)).

In *State v. Merchant*, 791 S.W.2d 840, 842–43[1] (Mo.App.1990), the court held that the evidence did not show that the killing was the result of sudden passion because Merchant tracked down the victims before the killings.

■ Like *Merchant*, the evidence in this case shows that Tatum tracked down Cobbins. Tatum persisted in gaining entry to the apartment after Marcia refused to open the door. Even after he was in the apartment Marcia told him to leave because she had called the police. Still Tatum persisted in finding Cobbins and when Marcia tried to stop him, threatened to kill her if she did not get out of the way. Further, Tatum opened the door and immediately began firing into the dark room without waiting to see if anyone was there and if so who it was.

The evidence shows just the opposite of sudden passion arising out of adequate cause. It shows that Tatum embarked on a calculated course of conduct to seriously injure or kill whoever was in the bedroom. There was no unexpected encounter or provocation which excited Tatum. Rather, he deliberately sought Cobbins to seriously injure or kill him.

■ Tatum argues that there was evidence of provocation because the jury requested a definition of involuntary manslaughter. However, the question of whether there was evidence upon which to base an instruction containing a paragraph on sudden passion arising from adequate cause was a question of law for the court and not a question of fact for the jury. The court correctly decided that there was no evidence to support such a submission. There was no error in refusing the instructions containing the paragraph on sudden passion arising from adequate cause.

■ Tatum next contends the court erred in accepting the verdict as to the count on which he was found guilty of first degree murder because he contends the jury poll revealed that one juror was unable to accept the verdict. When the jury returned and informed the court that it had reached a verdict, Tatum's counsel requested the court to poll the jury. The court called each juror by the number assigned to that juror. When the court asked juror 12 if the verdict announced was her verdict, the record reveals that the juror nodded her head. The court thereupon asked the juror "[y]ou are yes?" The record reveals that in response to the question the juror nodded her head. At that point Tatum's counsel stated that he did not hear the response of juror 12. The court stated that she had nodded. Counsel stated that he did not hear her and the court responded that she had nodded "yes." The court thereafter stated that it had heard juror 12 say "yes." Counsel stated that he did not hear the response and the court repeated that it had heard juror 12 say "yes."

There is no showing in the record that juror 12 gave any indication that she did not concur in the verdict. On the contrary the only evidence in the record is that she nodded her head "yes" and that the court heard her say "yes" in response to the query of whether or not it was her verdict. This court must give deference to the views of the trial judge who was present

during the time the jury was polled. *State v. Jackson*, 522 S.W.2d 317, 322 (Mo.App. 1975). Here, the trial judge stated that he heard juror 12 say "yes" and also that she had nodded her head "yes." There is no evidence of any negative response from juror 12 concerning her acceptance of the verdict. In that circumstance there is no basis for finding that juror 12 did not agree to the verdict.

■ Tatum next contends that the court erred in overruling his objection to the prosecutor's argument that Tatum had testified that he purposely caused the deaths of Cobbins and Whitney. The prosecutor told the jury that "we know by his actions and his words that it was his purpose to cause the death...." An objection followed which was overruled and the prosecutor continued by stating that Tatum had said that it was his purpose to cause serious physical injury or to kill. The prosecutor concluded by stating that Tatum was an admitted murderer who was going to kill whoever was in that room.

Tatum testified that he kicked the bedroom door open and started shooting and continued shooting until the gun was empty. He stated that he knew that if he shot into the bed that it would seriously hurt somebody and maybe kill them. He further stated that his purpose in shooting the gun five times was to seriously injure or to kill Cobbins.

It is apparent from the record that the prosecutor argued from the evidence drawn from Tatum's own testimony. The trial court has wide discretion in determining the scope of counsel's argument to the jury and unless an abuse of discretion is demonstrated which prejudices the defendant, the judgment will not be reversed for improper argument. *State v. Davis*, 653 S.W.2d 167, 176[23] (Mo.banc 1983). No abuse of discretion is shown here.

■ Tatum next contends the court erred when it overruled counsel's objection to testimony by Marcia that at one point Tatum could not spend the night in her apartment because he was on home detention. The contention is that this was evidence of another crime. This testimony was brought out by Tatum's counsel on cross-examination. In *State v. Miller*, 593 S.W.2d 898, 899 (Mo.App.1980), the court stated "[a] defendant is not entitled to complain about matters brought into the case by his own questions...." Here, the matter complained about was brought into the case by Tatum's counsel's questions, and he is in no position to complain. Tatum further raises some point about the prosecutor showing a paper to Tatum during his testimony and thereafter asking Tatum whether he knew what it was. Tatum stated that he did not know and no further reference to the paper was made. The contention is that this was actually a federal court indictment, but there is no showing in the record that the jury knew what the paper was or that it pertained to any previous criminal record or conduct on the part of Tatum. There was no error concerning that incident.

■ Tatum finally contends that the court erred in refusing to declare a mistrial because the court required the jury to continue deliberations after the jury had advised the court that it stood ten to two for conviction and requested further instructions from the court. The jury retired to deliberate at 12:37 p.m. At 2:55 p.m. the jury sent a note to the court which stated that the jury had quickly accepted first degree [murder] except for two persons who were uncertain about deliberation. The jury posed the question, "Where do we go from here?" Counsel for Tatum moved for a mistrial which was denied. The court responded to the question that it could not answer and referred the jury to the evidence and the instructions. At 3:35 p.m. the jury sent another note to the court which asked whether the jury could find Tatum guilty of involuntary manslaughter if he were found not guilty of murder one or two. The question concluded, "Question, and can we have a definition of involuntary manslaughter[?]" The court asked counsel what response should be sent, and the prosecutor stated that he would join defense counsel in moving for a mistrial. The court refused the motion for mistrial and sent a note to the jury advising that it

could not answer their question and referred them to the evidence and instructions. The jury returned with its verdict at 4:35 p.m.

Tatum contends the court coerced the jury to return a verdict of guilty because it required them to continue deliberations after it was told that ten jurors had quickly agreed on a verdict of murder in the first degree. In *State v. McNail*, 767 S.W.2d 84, 86[2] (Mo.App.1989), the court stated the rule with reference to the coercion of verdicts to be that "[w]here the 'totality of the circumstances' demonstrates that the trial court was virtually directing that a verdict be reached a verdict of guilty is the product of coercion and must be set aside." The situation here was entirely different from cases where it has been found that the court coerced the verdict. Tatum relies on *State v. Holt*, 592 S.W.2d 759 (Mo. banc 1980). There the jury foreman reported that the jury was deadlocked and told the court the jury stood 9–3 for a guilty verdict. The court declared a mistrial. That action was upheld against a contention that there was no manifest necessity to declare a mistrial. The court held that for the judge to send the jury back to deliberate at 12:45 or 1:00 in the morning after he knew how they stood would be a clear signal that the judge thought they were on the right track. *Id.* at 772. Here, the jury never informed the court that it was unable to reach a verdict, and the deliberation extended over four hours during the afternoon. The only evidence upon which Tatum bases an argument of coercion is the fact that the jury sent a note stating that it stood ten to two for a finding of guilty on first degree murder. That note said nothing about the jury being deadlocked, but only requested direction as to what the jury was to do in the situation where there was some dispute about whether Tatum acted with deliberation. The court properly stated that it could not answer the question and simply referred the jury to the evidence and instructions. The court gave the same response when the jury inquired if it could have a definition of involuntary manslaughter.

The note telling the court how the jury stood did not indicate an inability to reach a verdict, nor did the jury ask if it should deliberate longer. The court never told the jury to deliberate further, but only gave neutral responses to the jury questions which could not be construed to indicate any position of the court on guilt or innocence. *Holt* is clearly distinguishable on its facts from this case.

No action by the court deprived the jury of the freedom to deliberate as long or short as it desired and either return a verdict or announce that it was deadlocked. There is no showing that the court coerced the verdict.

The judgment is affirmed.

All concur.