**STATE of Missouri, Respondent,**

v.

**Joseph BOSTON, Appellant.**

**Joseph BOSTON, Appellant,**

v.

**STATE of Missouri, Respondent.**

**Nos. WD 48026, WD 49959.**

Missouri Court of Appeals, Western District.

Sept. 26, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 31, 1995.

Application to Transfer Denied Dec. 19, 1995.

Dennis J.C. Owens, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Frenando Bermudez, Asst. Atty. Gen., Jefferson City, for respondent.

Before LAURA DENVIR STITH, P.J., and LOWENSTEIN and HANNA, JJ.

LOWENSTEIN, Judge.

Appellant Joseph Boston was charged as an accomplice with one count of first degree murder, two counts of first degree assault, and three counts of armed criminal action. A jury returned guilty verdicts on all counts. Boston was sentenced to life imprisonment without the possibility of parole for the first degree murder conviction and concurrent life terms for all other convictions. Appellant filed a Rule 29.15 motion which the trial court denied after granting an evidentiary hearing. Both appeals have been consolidated in this court.

In the light most favorable to the verdicts, the evidence produced at trial established that on December 31, 1991, Michelle Owens hosted a New Year's Eve party at her parents' home for family and a small group of friends. Michelle's mother allowed her to host the party because her mother desired "to keep [friends and family] off the streets on New Year's." Joseph Bell, a disk jockey, agreed to play dance records at the party.

When the party was underway, appellant's sister Wanda Boston and her friend Lynn Scott came to the party, although they had not been invited. Wanda and Bell began arguing; swapping gang epithets, each threatened to kill the other. Several people at the party noticed that Bell had a gun protruding from his pocket. Wanda was asked to leave the party. She and Scott went into the Owens' front yard.

The disturbance continued in the front yard, then Wanda and Scott went to the nearby home of Dorothy McMurray, where appellant and several of his friends, including Clifton Hunt, Ronald Byers, and Michael Parris, were also having a party. Appellant Boston was informed his sister was in some sort of trouble. Boston, followed by his friends, went around the corner to the party where his sister remained. Testimony was conflicting as to whether Boston and his friends arrived by car or on foot. Additionally, Ronald Byers's brother Victor Byers, who was not originally at McMurray's house with Boston, arrived at the scene.

Boston and his friends were armed with pistols: Boston had a .25, Parris and Ronald Byers each had a .22, and Hunt had a .38. Boston claimed that the weapons were going to be fired in the air to celebrate New Year's.

Sadly, the guns were used for more than noisemakers that evening. When Boston and his friends arrived at the scene, Victor Byers asked Michelle's guests "What's up," not as a greeting, but as a slang challenge meaning "Do you want to fight?" Boston was also "hollering" the challenge, apparently to "start a fight or something." While several of the Owens' guests scrambled to get back inside the house, Boston opened his coat jacket and showed his gun to Michelle Owens.

Over Michelle's screams of "No, please. No, don't. Stop, Joe. Please don't do this," appellant pulled his gun and pointed it at her and Bell, who were in the doorway of the

house. James Porter, another party-goer, was retreating up the steps to the house, his back to appellant, when he heard a "click." Porter jumped into the doorway and pulled Bell and Michelle to the floor as shots rang out.

Testimony was confusing as to much of what went on during the shooting. However, it was established that during the shooting, Victor Byers, gun in hand, attempted to kick in the door, and a rock was thrown through a window. Some of the people inside the house attempted to escape to the safety of a bedroom at the rear of the house, while others held the front door shut against their assailants. Someone outside yelled that they were "going to kill" the "down north people."

The attackers managed to effect a triple shooting. Joseph Bell was shot "right off," once in the chest and once in the hand. Bell died in the living room. Norris Payne was shot in the right buttock while he was standing in the living room. Gerald Blewett was shot in the back, the bullet lodging near his spine. Testimony was that Boston emptied his gun into the side of the house, firing at least four times.

According to Boston's version of events, which changed considerably between the first time police interviewed him and the time of trial, after he retrieved his sister Wanda, he started to walk away and then heard someone kick the door and the shooting start. He then turned and fired at the side of the house toward the ground. Boston's firing occurred during the first of two major fusillades, after which he and his friends ran from the scene.

Boston claimed that he tried to stop Hunt and Ronald Byers from returning to shoot into the house a second time. Both Ronald Byers and Hunt admit to being the only two who returned to the scene, but each claims the other did the shooting the second time. Neither Byers nor Hunt claimed to have heard appellant's attempt to stop them from returning; Hunt's videotaped statement, played to the jury, suggests that appellant didn't return because he was out of bullets. In any event, there was ample testimony for the jury to believe that all three victims were hit during the first shooting, when appellant and his three friends pumped at least twenty rounds into the home for a period of five to six minutes.

Appellant admitted firing into the house, but maintained that he "shot out of fear," not because he wanted to kill anyone. Appellant described his actions in more detail to Detective Gary Wantland on a videotape which was played at trial:

WANTLAND: How many shots did you shoot?

BOSTON: Oh, about three or four.

WANTLAND: And what direction did you shoot?

BOSTON: The back towards the back of the house.

WANTLAND: You know if you hit anything?

BOSTON: Mmmm, probably a window, on the side of the house.

The prosecutor elicited further testimony from appellant upon cross-examination at trial:

Q. And you guys were just out for a little New Year's Eve fun with all those weapons, right?

A. To shoot them in the air, yes.

Q. Yeah. You didn't shoot them in the air that night, though, did you?

A. No.

Q. No. You shot them at a house full of people, right?

A. Yes.

Q. All of you, all four of you, shot all of these guns at that house full of people, didn't you?

A. Yes.

Appellant later explained his actions in more depth to the prosecutor:

A. I mean, when I turned around, I fired. When I turned, I fired, holding the gun like this (Indicating). As soon as I turned, I had the gun out and I fired like this, towards the back and the side of the house.

Q. The back of the house with all the people in it?

A. Yes.

In his statement to the police, appellant also directed them to where he had hidden the .25, and where three of his partners' weapons could be found.

Subsequent crime scene investigation revealed bullet holes in the screens and windows on the front of the house, ricochet marks and bullet holes in the enclosed porch area, a large-caliber bullet hole in the door, and a bullet hole in a wall inside the house. Five .25 caliber shell casings were found at the side of the house, and at least one of them was shown to have come from Boston's gun. A spent slug from Boston's gun was found in the side of the house. A firearm and toolmark examiner testified that the bullet recovered from Bell's autopsy could not have been fired by appellant's .25 caliber gun. The bullets in Payne and Blewett were not extracted.

### I.

■ Boston's first point on appeal is that there was insufficient evidence to support a conviction of first degree murder because there was no proof that he aided in the death of Bell after "deliberation." The critical inquiry on review of the sufficiency of evidence to support a criminal conviction is whether the evidence could reasonably support a finding of guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979). In assessing a challenge to the sufficiency of the evidence, the evidence together with all reasonable inferences to be drawn therefrom must be viewed in the light most favorable to the verdict, and evidence and inferences contrary to the verdict must be ignored. *State v. Guinan*, 665 S.W.2d 325, 327 (Mo. banc 1984), *cert. denied*, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984).

■ Boston is correct in stating that deliberation is necessary for a conviction of first degree murder based on accomplice liability. In *State v. O'Brien*, 857 S.W.2d 212, 218 (Mo. banc 1993), the court stated that "while the act of homicide may be imputed to an accessory, the element of deliberation may not be." Hence Boston could properly be convicted of first degree murder if there was evidence that he deliberated, despite the fact

that he did not fire the fatal shot. See MAI–CR 3d 313.02.

Deliberation means "cool reflection for any length of time no matter how brief." § 565.002, RSMo1994. There was ample evidence to support the jury's finding of deliberation. Boston and his friends, all armed, accompanied his sister to the Owens' home where she and Bell had threatened each other. Boston challenged the people at the party to a fight. Most damning of all, Boston threateningly brandished his weapon, then pointed it at Bell and others. Next, despite the hostess's pleas of "No, Joe," Boston fired repeatedly into the occupied house, toward a rear window.

■ Boston would have the court believe that he did not deliberate because he "only" discharged his weapon into the side of the house. This argument more squarely addresses the question of intent to kill rather than the question of deliberation, although intent to kill is easily found from the act of pumping round after round toward the rear window of a house full of people. It is wholly irrelevant that Boston did not fire the fatal shot, since his conviction is based upon accomplice liability. Boston does not contest that he and his accomplices fired into the house, only that he did not deliberate on Bell's death.

■ Similarly, Boston's testimony that he tried to stop two of his partners from returning a second time to riddle the house with bullets does not directly address the issue of deliberation upon the death of Bell, particularly when the evidence supports a finding that Bell died during the first barrage of bullets. Appellant asserts that there was no evidence that Bell fell during the first barrage when Boston and all his friends were firing; this assertion wholly departs from the record. The jury was not bound to believe Boston's testimony. Boston's description of his mental state was not binding on the jury either; the finding of deliberation may be inferred from and established by circumstances attending the homicide. *State v. Morris*, 639 S.W.2d 589, 592 (Mo. banc 1982), *cert. denied*, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983). The circumstances here

certainly support a finding beyond a reasonable doubt by the jury that Boston deliberated before Bell's killing. Appellant's first point is denied.

## II.

Boston's second point on appeal is that the motion court clearly erred in denying his 29.15 motion alleging ineffective assistance of counsel. The grounds upon which the claim was based were 1) failure to call appellant's oldest sister, Angela Boston, as a witness, 2) failure to open negotiations for a plea bargain, and 3) failure to object to the state's opening statement.

■ To establish a violation of the right to effective assistance of counsel, appellant must show that the defense attorney failed to exercise the customary skill and diligence that a reasonably competent attorney would perform under similar circumstances and that this deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Leisure v. State,* 828 S.W.2d 872, 874 (Mo. banc 1992).

The movant has the burden of proving the grounds for relief by a preponderance of the evidence. Rule 29.15(h).

■ Appellate court review is limited to a determination of whether the motion court's findings and conclusions are clearly erroneous. Rule 29.15(j). A judgment will be found clearly erroneous if the appellate court is left with a definite and firm impression that a mistake has been made. *Antwine v. State,* 791 S.W.2d 403, 406 (Mo. banc 1990), *cert. denied* 498 U.S. 1055, 111 S.Ct. 769, 112 L.Ed.2d 789 (1991).

■ Regarding the failure to call Angela Boston as a witness, Boston asserts that she would have testified that as to "the question of appellant's location during the shooting," Boston was in the driveway and never approached the front porch. Boston believes that his location shows a lack of deliberation. Without debating the importance of where Boston was standing as he threatened the party guests, pointed a gun at the victim and others, and then riddled a house with bullets, it is sufficient to note that Wanda Boston,

Lynn Scott, and appellant all testified that he was in the driveway and not on the front porch. The motion court found Angela's testimony to be cumulative. Failure to produce cumulative evidence does not constitute ineffective assistance of counsel. *Henderson v. State,* 770 S.W.2d 422, 423 (Mo.App.1989). The motion court's finding was not clearly erroneous.

■ Boston's second claim of ineffective assistance of counsel is based upon a failure to open negotiations for a plea bargain. Boston contends that his attorney's actions fell below the standard of reasonableness when she failed to approach the prosecutor with an offer for a plea. Boston points to the lesser sentences plea-bargained for by his accomplices, one of whom shot the bullet that killed Bell.

The court recognizes the relative severity of the sentence given Boston for the death of Bell, life imprisonment without possibility of parole. However, the discrepancy between the sentences given the various defendants does not prove by a preponderance of the evidence that Boston would have pled guilty to a lesser offense rather than go to trial. In fact, there is absolutely no evidence before the court that Boston desired to negotiate at all. Boston's argument smacks of sandbagging, and the motion court could easily have believed that Boston was hoping for an acquittal of all murder charges. Based upon the record, the motion court's conclusion was not clearly erroneous.

■ Boston's final claim of ineffective assistance is that reasonable trial counsel would have objected to the prosecution's opening statement because it did not address the element of deliberation. Ignoring such components of our legal system as closing arguments and verdict directors, Boston asserts that the jury could therefore convict him without evidence of his deliberation.

The allegation was not raised in the 29.15 motion or the amended motion. Hence it is waived under Rule 29.15(d). However, upon *ex gratia* review, the court finds the point devoid of merit.

## III.

 Boston's third point on appeal is that he should have been given nine peremptory strikes rather than six. Boston bases his argument on § 494.480.2.(1), RSMo (1994), which provides: "If the offense charged is punishable by death, the state shall have the right to challenge nine [venirepersons] and the defendant nine." Subparagraph (2) further provides that "In all other cases punishable by imprisonment in the penitentiary, the state shall have the right to challenge six and the defendant six."

Boston's argument is that his offense was "punishable by death," though the death penalty was waived. This argument was settled in *State v. Baldridge*, 857 S.W.2d 243, 255 (Mo.App.1993): "[B]ecause here the State waived the death penalty before trial, ... this is not a "capital case" nor a case dealing with an offense "punishable by death." *See State v. Morgan*, 453 S.W.2d 932, 933 (Mo. 1970). Point denied.

## IV.

 Boston's fourth point is that the trial court erred in refusing his instruction on involuntary manslaughter because the evidence presented a basis for Boston's acquittal of first degree murder and conviction instead of that lesser included offense.

The trial court is required to instruct the jury on a lesser included offense if there is a basis for acquitting the defendant of the charged offense and convicting him of the lesser included offense. § 556.046.2 RSMo (1994).

First degree murder requires that a person "knowingly cause the death of another person after deliberation upon the matter." § 565.020 RSMo (1994). Involuntary manslaughter requires that a person "recklessly cause the death of another person." § 565.024 RSMo (1994). For a jury to acquit appellant of first degree murder and find appellant guilty of involuntary manslaughter, there would have to be a basis to find that Boston acted recklessly instead of knowingly and deliberately in causing Bell's death.

The trial court was not obligated to instruct on involuntary manslaughter. The un-controverted evidence in the transcript was that Boston fired multiple shots toward a window on the side of a house which he knew was full of people; toward, as he admitted, the back of the house with all the people in it. Boston's conduct transcended mere recklessness. *See State v. Smith*, 747 S.W.2d 678 (Mo.App.1988) ("Defendant's conduct in shooting several times into the car showed an intent to do conduct which could kill an occupant of the vehicle. It went beyond recklessness." *Id.* at 680.) Point denied.

## V.

 Boston's final point on appeal is that the trial judge erred by not quashing the jury venire panel because the standard juror selection procedure was not followed. Here is how the procedure normally works, according to chapter 494 RSMo: First, the board of jury commissioners compiles a "master jury list" from public records such as driver's license and voter lists. § 494.410, RSMo (1994). Next, a list of "prospective jurors" is randomly picked from the "master jury list." "Prospective jurors" are then sent a summons and a juror qualification form. The "prospective jurors" who meet the qualifications as to citizenship, residency, age, and similar matters become a part of a "qualified jury list." § 494.415 RSMo (1994). Finally, members of the "qualified jury list" who come to the courthouse are assigned to particular divisions by being "randomly selected [for a division] in a manner specified by the board of jury commissioners from the qualified jury list." § 494.420 RSMo (1994).

In this case, 222 people reported to the courthouse as the "qualified jury list." Boston does not complain of the procedures used to randomly select the "qualified jury list." The deviation Boston complains of occurred when the trial court requested 45 people from the "qualified jury list" at 8:30 in the morning, before the members of the "qualified jury list" could be randomly assigned by computer to his and the other divisions. Instead of waiting for the computer to randomly choose 45 people for Division 9 from the *entire* 222–member "qualified jury list," the jury supervisor sent the *first* 45 members of the "qualified jury list" *who arrived at the*

*courthouse* to Division 9. According to Boston's point, this destroyed the randomness of his jury, such that he was denied a jury drawn from a fair cross-section of the community.

Boston bases his argument on the second sentence of § 494.420.2., RSMo (1995), which reads as follows: "This number of jurors [for each division] shall be *randomly selected* in a manner specified by the board of jury commissioners from the qualified jury list" [emphasis added]. The problem with Boston's argument is that, although the computer program specified by the board of jury commissioners was not used, the jurors used in his trial were still "randomly selected." No one could determine which 45 people of the 222–member "qualified jury list" would arrive first at the courthouse; therefore, the randomness of the selection was not skewed by the irregular procedure.

This court is in no way condoning the departure from the established manner of selecting jurors, despite the fact that the departure did not taint the randomness of the procedure in these particular circumstances. The test is whether the procedure "substantially complies" with the statute, and defendant further has the burden of showing a prima facie violation of the cross-section requirement. *State v. Sumowski*, 794 S.W.2d 643, 647 (Mo. banc 1990). The selection of jurors here, although irregular and not strictly by statute, did not destroy the randomness of the selection procedure. The procedure used substantially complied with the statute, and the jury that served was a fair cross-section. Point denied.

Accordingly, the judgments are affirmed.

All concur.