STATE of Missouri, Plaintiff–
Respondent,

v.

David W. STIDMAN, Defendant–
Appellant.

No. 27697.

Missouri Court of Appeals,
Southern District,
Division Two.

May 12, 2008.

Motion for Rehearing and Transfer to
Supreme Court Denied June 3, 2008.

Application for Transfer Denied
Aug. 26, 2008.

Kent Denzel of Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Daniel N. McPherson, Asst. Atty. Gen., of Jefferson City, MO, for respondent.

JEFFREY W. BATES, Chief Judge.

David Stidman (Defendant) was charged by information with murder in the first degree and armed criminal action for killing Robert Harris (Harris) by shooting him seven times in the head. *See* §§ 565.021, 571.015.[1] Following a jury trial, Defendant was convicted of the lesser-included offense of murder in the second degree and armed criminal action. The court imposed concurrent sentences of life in prison and 50 years in prison, respectively, for committing these offenses.

Defendant presents two points on appeal. First, he contends the trial court erred in refusing to give a voluntary manslaughter instruction because there was evidence that Defendant acted upon sudden passion arising from adequate cause. Second, he contends the trial court erred in refusing to give an involuntary manslaughter instruction because there was evidence that Defendant acted recklessly in shooting Harris. Because the trial court did not err in refusing to give these instructions, we affirm.

## I. Factual Background

Defendant does not challenge the sufficiency of the evidence to sustain his convictions. On appeal, this Court considers the facts and all reasonable inferences derived therefrom in a light most favorable to the verdict, and rejects all contrary evidence and inferences. *State v. Newberry,* 157 S.W.3d 387, 390 (Mo.App.2005); *State v. Cravens,* 132 S.W.3d 919, 921 (Mo. App.2004). Viewed from that perspective,

the favorable evidence supporting the State's case against Defendant is summarized below.

Defendant and Jennifer Banks (Banks) were married in March 1998. In January 2004, the couple had three young children who were approximately five years, three years, and one month old. The couple began having marital problems. In the spring of 2004, Banks met Harris at a club and began secretly dating him.

On May 1, 2004, Banks left Defendant and began living with Harris. Earlier that day, Banks and Defendant had argued, and Defendant pushed Banks off some steps from the laundry room into the garage. As Defendant approached Banks, she bolted from the garage into her vehicle and drove away.

Harris and Banks lived together until July 13, 2004, when she moved back to Defendant's home in order to be with her children. After three days, however, Banks changed her mind and decided to leave again. On July 16, 2004, Banks did not come home after work. She called Defendant and said there was no way she could be with him. Banks also said that she was not planning to pursue a relationship with Harris and that she was going to find an apartment and take the children. Defendant told Banks that she was playing games with him, called her names and was very angry and upset.

Banks had called Defendant from a pay phone near Harris' apartment. Later, she and Harris were watching a movie in the living room when someone began pounding on the front door. Banks opened the door and saw Defendant standing in the doorway, holding a 9mm pistol. Banks recognized the pistol as one that Defendant had

---

1. All references to statutes are to RSMo (2000).

owned for the past five or six years. Harris was sitting unarmed in a chair. Defendant immediately lifted the gun, cocked it, and rushed at Harris. Defendant jumped on top of Harris and tried to put the gun to his head. The two men struggled, and a shot went off that missed Harris and entered a bedroom door. Both men fell to the floor and continued struggling. A second shot was fired as Defendant was on top of Harris. Defendant then stood up and fired two shots into Harris' head. When the gun jammed, Defendant cleared the chamber and fired several more shots into Harris' head.

Banks ran into the kitchen. Defendant followed, pointing the gun at her. Banks grabbed for the gun, but Defendant yanked it away and said it was not loaded. Defendant grabbed Banks with the other hand and began choking her and swearing at her. She eventually fell to the floor. Defendant stood over her and said, "Look at what you f made me do. Look at what you f made me do. I just killed him and I'm going to jail for the rest of my life."

When police arrived at the apartment, they found Harris' body lying on its right side in the living room area. Harris was wearing a black T-shirt tucked into a pair of blue-jean shorts that were zipped-up and secure around his waist. The television was playing, and the volume was at a normal level. There was also music coming from a small stereo located just above the television.

Defendant drove to a fast food restaurant and parked in the drive-through just as the business was closing. When an employee approached his car, Defendant said he had killed someone and asked that the police be called. Defendant then went inside the restaurant and left his three young children in the car. While waiting for police, Defendant told the employee that he couldn't take it anymore; his wife was cheating on him with another guy, and he killed him.

After Defendant was placed under arrest, he told police that he had gone to the apartment to confront his wife and Harris. Officers found a nylon gun holster on the floorboard in front of the driver's seat in Defendant's car. Defendant's handgun was found across the street from the apartment complex. The gun's magazine was empty, but there was a live round in the chamber. Police recovered eight shell casings and four bullets from the apartment. A Highway Patrol firearms examiner determined that those shell casing and bullets had been fired from Defendant's gun, and gunshot residue was present on Defendant's hands.

Harris' autopsy revealed that he had seven gunshot wounds to the left side of his head. All of the bullets' paths went from left to right and downward. The blood flow from the wounds indicated that Harris was on his right side when he was shot. Four spent bullets were recovered from Harris' body. They were located in his chest cavity, the right side of his neck, his mouth and his upper right arm. The bullets that ended up in Harris' neck and chest cavity had followed a downward angle through his body.[2] No entrance wounds were found on any part of Harris' body other than his head. No soot or stippling was found near the wounds, which indicated that the gun barrel was two feet or more from Harris' head when the shots were fired. Small abrasions were found on Harris' right shoulder, left hand and forearm, and his knees. The

2. The medical examiner could not determine the trajectory of the other five entrance wounds, which included: one entrance wound in the cheek; one in front of and above the ear; one above the front earlobe; and two on the back side of the head.

cause of death was determined to be brain damage from multiple gunshot wounds to the head. The medical examiner was unable to identify which of the gunshots were fatal; any one of them could have caused Harris' death.

Defendant's two points on appeal challenge the trial court's decision not to submit instructions on the lesser-included offenses of voluntary and involuntary manslaughter. In reviewing these points, the evidence must be viewed in a light most favorable to Defendant. *State v. Newberry*, 157 S.W.3d 387, 393 (Mo.App. 2005). So viewed, the following evidence was adduced at trial.

Defendant and Banks had talked about separating before he learned of her affair. Defendant wanted to preserve the marriage, and Banks agreed to go to marriage counseling. Defendant first learned of the affair between Banks and Harris in May 2004. He argued with Banks before she moved out, and she told Harris about the incident. He called Defendant and threatened to "kick [Defendant's] ass" if he saw him. Around that same time, Defendant received calls from other persons telling him "to watch [his] back." According to Defendant, Banks had said that Harris belonged to a "car gang" in Arizona, he used to deal crack cocaine there, and he had been charged with assault.

On the day of the shooting, Defendant and Banks went to their respective jobs in the morning. Defendant got off work around 4:30 p.m. and picked up the children from the babysitter. He had planned a romantic evening with Banks, so he went to the store and purchased food, flowers, candles, bath oils and lingerie. He then went home and began preparing dinner. He fed the children early and put them to bed by 8:00 p.m. He set the table with flowers, placed the bath oils in the bath, and put the lingerie on the bed along with a love note.

Defendant expected Banks to arrive home between 8:30 and 9:30 p.m. When she was not there by 10:00 p.m., he called her employer and learned that she had left work at 8:00 p.m. Defendant got the children out of bed, loaded them into the car and began driving around to various locations looking for Banks. After searching about an hour, Defendant returned home. He left the children in the car. There was an answering machine message from Banks saying she was not coming home that night. Defendant recognized the phone number on the caller ID as belonging to a pay phone located near Harris' apartment. About five minutes later, Banks called again. She told Defendant that she had a change of heart and would not be coming home that night.

Defendant got angry about the whole situation and was mad at Banks and Harris. Defendant became upset and started crying. He began throwing Banks' clothing on a flatbed trailer outside the front door. As he did so, he came across his 9mm pistol in the closet. Defendant decided to go to Harris' apartment and "get to the bottom of it." He took the gun for protection. Defendant got back into the car and drove to the apartment building. He parked on the back side of the building. As Defendant explained, "I was pretty sure there was going to be a conflict and I didn't want the kids to see any of that at all." Defendant put the gun behind his back in the waistband of his pants and walked to Harris' apartment.

Defendant testified that as he approached the apartment door, he heard moaning inside which he believed was the sound of Banks having sex. Defendant pounded on the door until Banks answered, wearing only a "man's T-shirt." Harris came out of the bedroom, and the

two men rushed towards each other. Harris was unarmed. The two men began wrestling and fell to the ground. Shots were fired from Defendant's gun while they were on the floor. Defendant admitted that: (1) a live round would have to have been chambered before his pistol would fire; and (2) the trigger on the semi-automatic pistol would have to have been pulled each time a shot was fired. According to Defendant, no shots were fired after he stood up. He did not realize that he was holding the gun until Banks asked for it and grabbed his hand. Defendant kept the gun, walked out of the apartment and got in the car. As he drove away, he threw the gun out of the car window.

During the instruction conference, defense counsel requested that the court submit the lesser included offenses of voluntary and involuntary manslaughter. Counsel tendered appropriate instructions for that purpose. All of these instructions were refused after the trial court ruled that there was insufficient evidence to support either submission. Defendant was convicted of second-degree murder and armed criminal action. This appeal followed.

## II. Standard of Review

■ Voluntary manslaughter and involuntary manslaughter are lesser-included offenses of second-degree murder. *See* § 565.025.2(2). In determining whether a trial court erred in refusing to submit an instruction on a lesser-included offense, the evidence is viewed in the light most favorable to the defendant. *State v. Avery*, 120 S.W.3d 196, 200 (Mo. banc 2003). "Nevertheless, a defendant is not entitled to an instruction on a lesser-included offense unless the instruction is supported by the evidence and any logical inferences derived from that evidence."

*State v. Newberry*, 157 S.W.3d 387, 393 (Mo.App.2005). "A trial court is required to instruct on a lesser included offense if the evidence, in fact or by inference, provides a basis for both an acquittal of the greater offense and a conviction of the lesser offense, and if such instruction is requested by one of the parties or the court." *State v. Redmond*, 937 S.W.2d 205, 208 (Mo. banc 1996); *see also State v. Beeler*, 12 S.W.3d 294, 299 (Mo. banc 2000); *State v. Deckard*, 18 S.W.3d 495, 499 (Mo.App.2000); § 556.046.2(2) RSMo Cum.Supp. (2003).

## III. Discussion and Decision

In Point I, Defendant contends the trial court erred in refusing to submit the lesser-included offense of voluntary manslaughter to the jury. The salient issue is whether there was an evidentiary basis for the jury to acquit Defendant of second-degree murder and convict him of voluntary manslaughter.

Insofar as relevant here, a person commits the crime of murder in the second degree if he or she "[k]nowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person...." § 565.021.1(1). A person commits the crime of voluntary manslaughter if he "[c]auses the death of another person under circumstances that would constitute murder in the second degree under subdivision (1) of subsection 1 of section 565.021, except that he caused the death under the influence of sudden passion arising from adequate cause...." § 565.023.1(1). The defendant bears "the burden of injecting the issue of influence of sudden passion arising from adequate cause" into the case. § 565.023.2.

■ Sudden passion is defined as "passion directly caused by and arising out of provocation by the victim or another

acting with the victim which passion arises at the time of the offense and is not solely the result of former provocation[.]" § 565.002(7). Adequate cause is defined as "cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self-control[.]" § 565.002(1). Acting under the influence of sudden passion arising from adequate cause "is a special negative defense to the crime of conventional second degree murder." *State v. Boyd,* 913 S.W.2d 838, 842 (Mo.App.1995).[3]

■ The trial court refused to give instructions submitting voluntary manslaughter because there was insufficient evidence that Defendant acted under the influence of sudden passion. On appeal, Defendant contends this was error. He argues that the evidence was sufficient to establish sudden passion because: (1) before Defendant entered the apartment, he became enraged when he heard his wife having sex with Harris; and (2) Harris "came at him" when Defendant entered the apartment. Defendant claims this evidence showed sudden passion because it was directly caused by and arose out of provocation by both Harris and Banks at the time of the offense and was not solely the result of former provocation. We find this argument untenable for two reasons.

First, the evidence showed Defendant's rage was not sudden. Defendant had known since May 2004 that Banks had been having sex with Harris. After learning from Banks that she was not coming home, Defendant admitted that he was very angry, upset and crying. He knew

Banks had called from a pay phone near Harris' apartment. Defendant decided to go there and "get to the bottom of it." Defendant took his pistol with him. When he arrived at the apartment, he parked in the back of the building because he was "pretty sure there was going to be a conflict and [he] didn't want the kids to see any of that at all." He hid the pistol behind his back in the waistband of his pants. He walked to Harris' apartment, expecting to find Banks and Harris together and confront them. This is not a case of a "sudden, unexpected encounter or provocation tending to excite the passion beyond control." *State v. Simmons,* 751 S.W.2d 85, 91 (Mo.App.1988), *overruled on other grounds by State v. Redmond,* 937 S.W.2d 205, 209–10 (Mo. banc 1996); *see also State v. Tatum,* 824 S.W.2d 22, 26 (Mo.App.1991); *State v. Merchant,* 791 S.W.2d 840, 842–43 (Mo.App.1990).

■ Second, there was insufficient evidence to prove that Defendant acted under the influence of sudden passion directly caused by, and arising out of, any provocation by Harris. "Sudden passion cannot arise unless a defendant shows the victim took some action to inflame the defendant and that the defendant was not the initial aggressor." *Hill v. State,* 160 S.W.3d 855, 859 n. 5 (Mo.App.2005); *State v. Everage,* 124 S.W.3d 11, 16 (Mo.App. 2004); *State v. McCoy,* 971 S.W.2d 861, 864 (Mo.App.1998). It is undisputed that Harris was unarmed and Defendant was wielding a pistol as he entered the apartment. Accepting as true Defendant's testimony that Harris "came at him," such conduct is consistent with acting in self-defense against the threat of Defendant's

---

**3.** If the defendant satisfies his burden of injecting the issue, "an instruction submitting conventional murder in the second degree must submit, as an element of the crime, a third paragraph that defendant did not do so under the influence of sudden passion arising from adequate cause." *Id.* The trial court also must give a separate, voluntary manslaughter instruction patterned after MAI–CR 3d 313.08. *Id.;* Notes on Use 4, MAI–CR 3d 313.04. The instructions tendered by Defendant complied with these requirements.

gun. Therefore, Harris' action did not constitute provocation because it occurred simultaneously with, or in direct response to, Defendant's threatened use of deadly force. *See, e.g., State v. Hahn,* 37 S.W.3d 344, 352 (Mo.App.2000) (victim's act of jumping on defendant was self-defense against the threat of defendant's butcher knife and not a sudden or unexpected provocation). Apart from Defendant's testimony that Harris "came at him," there is no other evidence showing that Harris took any action at the apartment to inflame Defendant.[4] To the contrary, the evidence showed that Defendant was clearly the initial aggressor who tracked down Harris and killed him. *See Tatum,* 824 S.W.2d at 26; *Merchant,* 791 S.W.2d at 842–43. Because there was insufficient evidence to prove that Defendant acted under the influence of a sudden passion arising out of provocation at the time of the offense, there was no basis for the jury to acquit Defendant of second-degree murder and convict him of voluntary manslaughter. Therefore, the trial court did not err in refusing to give Defendant's jury instructions submitting the latter offense for the jury's consideration. Point I is denied.

■ In Point II, Defendant contends the trial court erred in refusing to submit the lesser-included offense of involuntary manslaughter to the jury. In order to convict Defendant of second-degree murder, the jurors had to find that: (1) Defendant caused Harris' death by shooting him; and (2) Defendant knew or was aware that his conduct was causing or was practically certain to cause Harris' death. *See* §§ 565.021.1(1), 562.016.3(2). Insofar as relevant here, a person commits the crime of first-degree involuntary manslaughter if he "[r]ecklessly causes the death of another person...." § 565.024.1(1). A person acts recklessly "when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." § 562.016.4. "Recklessness resembles knowing conduct in one respect in that it involves awareness, but it is an awareness of risk, that is, of a probability less than a substantial certainty. By contrast, to act knowingly is to be aware that the conduct is practically certain to cause a result." *State v. Beeler,* 12 S.W.3d 294, 299 (Mo. banc 2000). Once again, the salient issue is whether there was an evidentiary basis for the jury to acquit Defendant of second-degree murder and convict him of first-degree involuntary manslaughter because he acted recklessly, rather than knowingly, in killing Harris. *See State v. Newberry,* 157 S.W.3d 387, 393 (Mo.App.2005).

■ Defendant contends his tendered instructions on involuntary manslaughter should have been given because there was evidence that he acted recklessly in killing Harris. Defendant first points to his testimony that he did not remember actually shooting Harris and that he did not intend to shoot or kill Harris. We find this argu-

---

4. The May 2004 telephone call that Defendant received from Harris only supported an inference of former provocation. *See State v. Deckard,* 18 S.W.3d 495, 501 (Mo.App.2000). The cases upon which Defendant relies to show that Harris took some action to inflame him are factually distinguishable and, therefore, inapposite. *See State v. Redmond,* 937 S.W.2d 205, 209 (Mo. banc 1996) (there was sufficient provocation when the victim confronted the defendant in a threatening manner and reached into a pocket for what defendant thought was a gun); *State v. Fears,* 803 S.W.2d 605, 608–09 (Mo. banc 1991) (there was sufficient provocation when the defendant attempted to turn away, but the victim prevented defendant from leaving and pushed him).

ment unavailing because: (1) Harris was shot seven times in the head; (2) the absence of stippling proved that all of the shots had to be fired from a distance of greater than two feet away; and (3) Defendant admitted that he had to pull the trigger each time a shot was fired. As this Court noted in *State v. Deckard,* 18 S.W.3d 495 (Mo.App.2000), a defendant's denial of an intention to kill does not necessarily require submission of an involuntary manslaughter instruction when the physical facts and the defendant's conduct renders such testimony unreasonable and inconsistent with common experience. *Id.* at 503. The case at bar falls within that category.

 Defendant next argues that, by wrestling with Harris while holding the gun, Defendant disregarded the risk of death or serious physical injury when the first shot was fired. According to Defendant, "even assuming [Defendant] voluntarily shot [Harris] more than once, the shots after the first were irrelevant, because [Harris] was essentially dead before those shots were fired." This argument has no merit for two reasons. First, we note that the argument lacks factual support. The medical examiner was unable to identify which of the gunshots caused the fatal injury. Because the last shot could have caused Harris' death, he was not "essentially dead" after the first shot was fired. Second, Defendant's conduct of shooting Harris seven times in the head transcended recklessness. *See Deckard,* 18 S.W.3d at 503; *State v. Green,* 778 S.W.2d 326, 327–28 (Mo.App.1989), *overruled on other grounds by State v. Beeler,* 12 S.W.3d 294, 299 (Mo. banc 2000); *State v. Boyd,* 913 S.W.2d 838, 843 (Mo.App. 1995). "[I]t will be presumed that a person intends the natural and probable consequences of his acts." *State v. O'Brien,* 857 S.W.2d 212, 218 (Mo. banc 1993). Defendant's act of shooting Harris seven times in the head was a means likely to produce death, and Defendant is presumed

to have intended for death to follow that act. *Deckard,* 18 S.W.3d at 503–04; *Green,* 778 S.W.2d at 328. "[I]ntent to cause serious physical injury can be inferred from the defendant's use of a deadly weapon on a vital area of a victim's body." *State v. Tracy,* 918 S.W.2d 847, 851 (Mo.App.1996).

In short, Defendant shot Harris in the head seven times. Because this conduct transcended recklessness, no rational juror could reasonably conclude that Defendant did not act knowingly in killing Harris. *State v. Newberry,* 157 S.W.3d 387, 397 (Mo.App.2005); *Deckard,* 18 S.W.3d at 504; *State v. Boston,* 910 S.W.2d 306, 312 (Mo.App.1995). Because there was no basis for the jury to acquit Defendant of second-degree murder and convict him of involuntary manslaughter, the trial court did not err in refusing to instruct the jury on the latter offense. Point II is denied.

The judgment of the trial court is affirmed.

BARNEY and LYNCH, JJ., Concur.