STATE of Missouri, Plaintiff–
Respondent,

v.

Ronnie L. NEWBERRY, Defendant–
Appellant.

Nos. 25907, 26398.

Missouri Court of Appeals,
Southern District,
Division Two.

March 11, 2005.

Melinda K. Pendergraph, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Adriane Dixon Crouse, Asst. Atty. Gen., Jefferson City, MO, for respondent.

JEFFREY W. BATES, Chief Judge.

In May 2002, Ronnie Newberry ("Defendant") was charged by information with committing four felonies. Count I charged Defendant with murder in the second degree for killing Clarence Winters ("Clarence") by striking him with a hammer.[1] § 565.021.1.[2] Count II charged Defendant with armed criminal action for committing second degree murder with a dangerous instrument. § 571.015.1. Count III charged Defendant with assault in the first degree for attempting to kill or cause serious physical injury to Bill Vaughn ("Bill") by striking him with a hammer. § 565.050.1. Count IV charged Defendant with armed criminal action for committing first degree assault with a dangerous instrument. § 571.015.1.

As required by § 557.036 (Cum.Supp. 2004), the case was tried to a jury in a bifurcated proceeding. In the first stage of the trial, the jurors only decided whether Defendant was innocent or guilty of the submitted offenses. See § 557.036.2 (Cum. Supp.2004). On Count I, Defendant was convicted of the lesser-included offense of voluntary manslaughter for killing Clarence. See § 565.025.2(2)(a). On Count III, Defendant was convicted of the lesser-included offense of assault in the second degree for seriously injuring Bill. See MAI–CR 3d 319.06; MAI–CR 3d 319.10. Defendant also was found guilty on both counts of armed criminal action. In the penalty phase of the trial, the jury recommended the following terms of imprisonment as punishment: 15 years for Count I; 10 years for Count II; 7 years for Count III; and 7 years for Count IV. The trial court followed the jury's recommendations when entering judgment. The sentences on Counts I and II were ordered to run concurrently. The sentences on Counts III and IV were ordered to run concurrently with each other, but consecutively with the sentences imposed on Counts I and II.

Defendant has appealed the judgment and sentences, presenting two points for decision. The first point asserts that the trial court erred in refusing to give Defendant's tendered Instructions A and C. Instruction A would have submitted the lesser-included offense of involuntary manslaughter in the first degree for the jury's consideration. Instruction C would have submitted the offense of armed criminal action with involuntary manslaughter hypothesized as the underlying felony. Defendant claims these instructions should have been given because there was an evidentiary basis upon which the jury

---

1. Since several witnesses share the same surname as the crime victims, we use their given names for purposes of clarity. No disrespect is intended.

2. All references to statutes are to RSMo (2000), unless otherwise indicated.

could have found that Defendant acted recklessly in killing Clarence with a hammer. The second point asserts that the trial court erred in overruling Defendant's objection to the testimony of two police officers about statements Defendant made to them before his arrival at the police station. Defendant claims these statements were inadmissible because he was subjected to custodial interrogation without being given his *Miranda* warning.[3] We affirm.

Defendant does not challenge the sufficiency of the evidence to sustain his convictions. In this appeal, we consider the facts and all reasonable inferences derived therefrom in a light most favorable to the verdict, and we reject all contrary evidence and inferences. *State v. Cravens*, 132 S.W.3d 919, 921 (Mo.App.2004); *State v. Campbell*, 122 S.W.3d 736, 737 (Mo.App. 2004). Viewed from that perspective, the favorable evidence supporting the State's case against Defendant is summarized below.

Mary Winters ("Mary") and Martha Barton ("Martha") are sisters. In February 2002, Mary was married to Clarence. They lived in a house on Douglas Street in Springfield, Missouri, along with their 10–year–old grandson, H.R. Winters ("H.R."). Martha lived in Mansfield, Missouri, with her boyfriend, Bill. Although Bill lived with Martha, he was still married to the Winters' daughter, Velma Vaughn ("Velma"). Bill and Velma were estranged and had been separated for five years. Velma lived in Versailles, Missouri, with Defendant and their two children, Violet and Lena.

On February 3, 2002, Defendant came to Springfield with Velma and Lena, who was then four months old. They arrived at the Winters' home before noon. That same day, Martha and Bill drove from Mansfield to Springfield. They arrived at the Winters' home around 2:15 p.m.

The adults visited with one another in the living room of the Winters' home while H.R. played outside. Clarence, who had suffered a stroke six years earlier, was seated in a chair. He could no longer walk and used a walker or wheelchair to get around. He had also lost the use of his left hand as a result of the stroke. Bill was sitting on a couch near Clarence's chair. Defendant, Velma and Lena were sitting together on another couch in the same room. The plan was to eat supper together and watch the Super Bowl on television.

Everything was calm while all of the adults were together. No one was fighting or arguing with anyone else. Clarence and Bill had known each other for 15–20 years and always got along well. Around 5:00 p.m., Mary and Martha left the Winters' home to visit their brother, who lived about five minutes away by automobile from Mary's house. They were gone about 15 minutes.

While Mary and Martha were out, Defendant severely injured Clarence and Bill. Velma and H.R. each testified about what happened. H.R. was playing in the backyard when he heard Clarence yell for help. H.R. ran around to the front of the house and up onto the porch. Once there, H.R. saw Defendant hit Clarence with Defendant's yellow-handled hammer. Bill was still sitting on the couch and yelled at H.R. to call the police. Defendant then struck Bill with the hammer. After doing so, Defendant threatened to kill H.R. if he told anyone what he had seen. Despite the threat, H.R. ran down the street to call the police.

3. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

H.R.'s account of what happened was corroborated by Velma. She testified that she was sitting on one couch, feeding Lena a bottle. Clarence was in his chair, and Bill was sitting on the other couch. While they were talking to each other, Defendant left the room and went outside. When he came back into the living room, he was holding his yellow-handled claw hammer. Defendant used the hammer to strike Clarence on the left side of his forehead. Next, Defendant struck Bill on the back of the head with the hammer. Neither Clarence nor Bill had offered any resistance or attempted to fight with Defendant before being struck in the head with the hammer.

About the time Defendant's attack upon the victims concluded, Mary and Martha returned from visiting their brother. As they were getting out of the Winters' van, H.R. ran up and told them Clarence was hurt. Defendant and Velma, who was carrying Lena, ran out of the house and got into the van. They drove to the home of Velma's brother, who also lived in Springfield.

Mary and Martha went inside and found Clarence bleeding profusely with a large wound on his forehead. A portion of Clarence's brain was protruding through the hole in his forehead. He was still sitting in the same chair in which he had been seated when Mary and Martha left. Likewise, Bill was still sitting on the same couch where he had been when Mary and Martha left. He was leaning forward with his head down. The back of his head was cut and bleeding profusely. His eyes were open, but he was unable to move or speak. The women provided first aid until the paramedics arrived. Bill and Clarence were both taken from the scene to St. John's Hospital.

Police arrived at the Winters' home at approximately the same time as emergency personnel. Shortly after 6:00 p.m., De-fendant, Velma and Lena returned to the scene in the Winters' van. Officer Kent Bishop ("Officer Bishop") approached the van and asked Defendant if he knew anything about what was going on inside the house. Defendant replied that he came out of the bathroom and "they were trying to rape the baby, so he hit them." Defendant was handcuffed and detained for questioning. While Defendant was riding in a patrol car driven by Officer Jonathan Spaeth ("Officer Spaeth"), Defendant voluntarily stated that when he came out of the bathroom, Bill was trying to rape Lena.

After Defendant arrived at the police station, Defendant was read his *Miranda* rights. He then voluntarily gave two videotaped statements to police. Each statement was over an hour in length. Edited versions of the statements were played for the jury. In both statements, Defendant claimed Clarence and Bill injured each other during an altercation. Defendant said he was not involved, other than to remove Lena from the living room to keep her from getting hurt. Defendant claimed the altercation resulted because Bill tried to rape Lena, and Clarence tried to stop him from doing so.

On February 4, 2002, Clarence died at St. John's Hospital. Dr. James Shelly, the pathologist who performed an autopsy on Clarence, found only two injuries on Clarence's body, both to his head. He had a small laceration on his upper left eyebrow and a penetrating injury in his left forehead. Brain tissue had extruded into this wound opening. Two pieces of bone, which remained attached to the skull on each side of the opening like a door on a hinge, had been driven backwards at a 45-degree angle about 1 inch into the temporal lobe of Clarence's brain. One bone fragment measured about 3.5 centimeters in length. This fragment was pushed 2.5

centimeters down into the brain. The other bone fragment measured 2 inches in length and 1 inch in width. The penetrating wound to Clarence's skull caused a circumferential fracture, which permitted the parts of the skull above and below the fracture to move independently of one another. This wound extended 2 inches into the brain. Dr. Shelly opined that Clarence's injuries were consistent with being struck in the forehead with the claw end of a hammer. The penetration of the hammer claw and the bone fragments caused severe tissue damage and extensive hemorrhaging into the brain. Dr. Shelly had only seen similar, deep penetrating brain injuries caused by bullets. Such a wound could only be caused by an action involving tremendous force, like a gunshot, automobile accident or dropping a front-end loader on someone's head. The penetrating hammer blow would have been immediately incapacitating, making any further defense or movement impossible. It was this single blow which ultimately caused Clarence's death.

Defendant also inflicted severe, permanent injuries upon his other victim. Bill spent three weeks in the hospital and six months at the rehabilitation center in Mt. Vernon, Missouri. Despite this lengthy treatment, his right arm remains paralyzed; his ability to walk is substantially limited; and he is no longer able to speak, except to say "Yes" or "No."

Additional facts necessary to the disposition of the case are included below as we address Defendant's two points on appeal.

### Point I

Defendant's first point posits trial court error in refusing to give Instructions A and C. As noted above, these proposed instructions relate solely to Defendant's criminal responsibility for Clarence's death.

Voluntary manslaughter for causing death under the influence of sudden passion arising from adequate cause and involuntary manslaughter in the first degree for recklessly causing death are both lesser-included offenses of murder in the second degree. *See* §§ 565.023.1(1); 565.024.1(1); 565.025.2(2)(a)-(b). At the instruction conference, Defendant tendered Instruction 5, which was patterned after MAI–CR 3d 313.04. This instruction submitted the offense of murder in the second degree (conventional) for striking Clarence with a hammer when Defendant knew or was aware that his conduct was causing or was practically certain to cause Clarence's death. At Defendant's request, this instruction included paragraph Third requiring the jurors to determine whether Defendant did so under the influence of sudden passion arising from adequate cause. The trial court granted Defendant's request to give this instruction.[4]

Since the issue of sudden passion was submitted in Instruction 5, Defendant tendered Instruction 7, which submitted the lesser-included offense of voluntary manslaughter for killing Clarence. *See* MAI–CR 3d 313.08; § 565.023.1(1); § 565.025.2(2)(a). The trial court granted Defendant's request to give this instruction.

Defendant also tendered Instruction A, which submitted the lesser-included offense of involuntary manslaughter. This instruction was patterned after MAI–CR 3d 313.10 and hypothesized that Defendant recklessly caused Clarence's death by striking him with a hammer. Defendant's counsel argued this instruction should be given because "the evidence and interpre-

---

4. The trial court decided to give Instruction 5 over the State's objection that the issue of sudden passion was not supported by the evidence.

tation of the evidence could be that [Defendant's] actions were reckless. One of the statements that Velma made is that [Defendant] accidentally hit Bill, and we believe that the same could apply to Clarence Winters, and we would submit involuntary manslaughter." Defendant also tendered Instruction C, which submitted the offense of armed criminal action based on an underlying felony of involuntary manslaughter in the first degree. The trial court refused Defendant's request to give these two instructions. He challenges both rulings on appeal.

■ In reviewing whether a trial court erred in failing to instruct the jury on a lesser-included offense, we review the evidence in a light most favorable to the defendant. *State v. Williams,* 66 S.W.3d 143, 155 (Mo.App.2001); *State v. Battle,* 32 S.W.3d 193, 195 (Mo.App.2000). Nevertheless, a defendant is not entitled to an instruction on a lesser-included offense unless the instruction is supported by the evidence and any logical inferences derived from that evidence. *Williams,* 66 S.W.3d at 155; *Battle,* 32 S.W.3d at 196.

Our resolution of this point is governed by statute. Defendant was charged with murder in the second degree for killing Clarence. Section 556.046.1 states, in pertinent part, that "[a] defendant may be convicted of an offense included in an offense charged in the indictment or information. An offense is so included when: ... (2) It is specifically denominated by statute as a lesser degree of the offense charged ...." As noted above, involuntary manslaughter is specifically denominated as a lesser degree of second degree murder. § 565.025.2(2)(b). Nevertheless, "[t]he court shall not be obligated to charge the jury with respect to an included offense unless there is a basis for a verdict acquitting the defendant of the offense charged and convicting him of the included

offense." § 556.046.2. Therefore, we must decide whether there was a basis for the jury to acquit Defendant of second degree murder, but convict him of involuntary manslaughter.

As relevant here, a person commits the crime of second degree murder if he or she "[k]nowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person ...." § 565.021.1(1). A person commits the crime of involuntary manslaughter in the first degree if he or she, *inter alia,* "[r]ecklessly causes the death of another person ...." § 565.024.1(1). A person acts recklessly "when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." § 562.016.4. To put a finer point on the issue presented, the question is whether there was a basis for the jury to acquit Defendant of second degree murder, but to convict him of first degree involuntary manslaughter, because he acted recklessly, rather than knowingly, in killing Clarence.

Viewing the evidence and any logical inferences flowing therefrom in a light most favorable to Defendant, we find nothing to rationally support the conclusion that Defendant did not act knowingly in killing Clarence. Defendant did not testify at trial. The two videotaped statements he gave to police would not support an involuntary manslaughter instruction because Defendant blamed Clarence's injuries on Bill. At the instruction conference, defense counsel argued an involuntary manslaughter instruction was supported by Velma's testimony. The judge was not persuaded, and we believe his decision was correct.

During Martha's cross-examination, she testified that she spoke with Velma at the crime scene after she returned with Defendant; Velma said, "Bill had hit Clarence." Velma was called as a prosecution witness and testified that she saw Defendant, without provocation, hit Clarence and Bill in the head with a hammer. During cross-examination by defense counsel, Velma was asked about inconsistent stories she had told Martha and the police. Velma denied that she ever told Martha that Bill hit Clarence. Velma admitted, however, that during questioning at the police station, she initially denied knowing anything about what happened and claimed to have been in the bedroom listening to the radio the whole time. She then gave the following testimony:

Q. Okay. And when you were talking with the police officer some more, the police officer told you that he didn't think you were telling the truth?

A. Yes.

Q. And so then you told the police officer that Bill had reached for the hammer?

A. No.

Q. You didn't tell him that?

A. No.

Q. And you told the police officer that Bill had accidentally been struck with the hammer?

A. Yes.

Q. And you told the police officer that?

A. Yes.

Q. And the police officer told you that he didn't think you were telling the truth?

A. Yes.

Q. And that's when you told him that [Defendant] hit him with the hammer?

A. Yes.

On redirect, Velma testified that she did not initially tell the police what she knew because she was scared. She was afraid she would go to jail as well because she was in the house when the incident happened.

Taken together and considered in context, the testimony of Martha and Velma would only support the conclusion that Bill had been accidentally struck with the hammer during an altercation with Clarence. Their testimony would not support the conclusion that Defendant accidentally struck Clarence.

■ On appeal, Defendant has changed his position from that advanced at trial. He now argues the involuntary manslaughter instruction should have been given because the State introduced Defendant's statement, made to Officer Bishop at the scene, that Defendant "came out of the bathroom, that they were trying to rape the baby, so he hit them." Defendant argues this statement would permit the jury to find that Defendant was trying to defend his daughter from a sexual assault, but responded to the threat recklessly by inflicting an ill-aimed blow to Clarence's head. We disagree.

In *State v. Williams*, 66 S.W.3d 143 (Mo.App.2001), Williams injected the victim with a lethal dose of methamphetamine. Williams later told police that she meant to kill or seriously injure the victim when she gave him the drugs. *Id.* at 155–56. Williams was charged with second degree murder. At trial, Williams tendered an instruction on involuntary manslaughter based on the argument that she acted recklessly in killing the victim. The trial court refused to give the instruction. On appeal, this Court concluded that, even when viewed favorably to Williams, the evidence showed she was practically certain the victim would be killed or seriously

injured by the drug overdose. *Id.* at 156. No involuntary manslaughter instruction should have been given because "we can find nothing that would indicate a jury could conclude that Defendant did not act knowingly." *Id.*

In *State v. Brummall*, 51 S.W.3d 113 (Mo.App.2001), the female victim had been stabbed numerous times and was found dead with a knife sticking out of her face. Brummall's blood was found on an entertainment center in the room where the victim was stabbed. Forensic examiners also found blood from one or two people other than the victim on the knife. Brummall could not be excluded as a possible source of this blood. Hairs not belonging to either Brummall or the victim were found on her body. Brummall was charged with first degree murder and found guilty of second degree murder. At trial, Brummall offered an instruction on involuntary manslaughter. The trial court refused the instruction. On appeal, the Western District affirmed that ruling:

> Brummall contends that there was no evidence as to exactly what happened during the altercation that resulted in Jamie's death, and there was no evidence of how many people were in the house at the time Jamie was killed. Brummall further contends that evidence of another unknown person's DNA was found on the handle of the knife, and numerous hairs, not consistent with his hair, were found on Jamie's body, and therefore the possibility of one or more other people being present during the altercation cannot be ruled out. Brummall argues that the jury reasonably could have inferred that any role he played in the stabbing of Jamie was a reckless response to injuries inflicted on him at the scene. Again, we find there was no evidence by which a reasonable jury could find that Brummall recklessly caused Jamie's death,

and any such finding by the jury would be based on pure speculation.

*Id.* at 117–18.

In *State v. Deckard*, 18 S.W.3d 495 (Mo. App.2000), Deckard entered a pizza restaurant holding a shotgun. In an angry tone, Deckard told the victim, who was standing behind the counter, to come outside. Deckard pointed the shotgun at the victim's head when he reached for a telephone. Deckard ordered the victim to place the phone back in the receiver. After victim complied, he was shot in the head. Deckard was charged with first degree murder. At trial, the court instructed the jury on first degree murder and refused Deckard's tendered instructions on second degree murder, voluntary manslaughter and involuntary manslaughter. On appeal, Deckard argued the trial court erred in refusing the instruction on involuntary manslaughter. Deckard asserted the jury could have found he acted recklessly, based on evidence that he took the gun inside the restaurant to intimidate the victim and thought the weapon was unloaded. This Court rejected Deckard's argument. Since a person is presumed to have intended for death to follow from acts which are likely to produce that result, we held that Deckard's actions "transcended recklessness" and that "no rational factfinder could conclude [Deckard] did not act knowingly." *Id.* at 503–04.

In *State v. Hamlett*, 756 S.W.2d 197 (Mo.App.1988), an argument occurred between Hamlett and the victim, who was seated in a car. According to Hamlett, the victim got out of the car and then appeared to be reaching for a gun or tire tool. Without waiting to find out, Hamlett intentionally kicked victim in the throat. Hamlett then used his fists to hit victim in the head three or four times. Hamlett kicked victim again and hit him two more

times before victim fell to the ground. Victim died of a massive brain hemorrhage caused by one or more blows to the head. *Id.* at 200. At trial, the court gave instructions on second degree murder and voluntary manslaughter, but it refused Hamlett's request for an instruction on involuntary manslaughter. On appeal, we affirmed that ruling because Hamlett's "attack on [victim] was deliberate, not accidental, and even if Hamlett, as he says, had no desire to kill [victim], such a result followed. Since the assault, by fists and feet, was a means likely to produce death, Hamlett is presumed to have intended that death would follow his acts." *Id.* at 200–01.

Applying the foregoing precedents here, the trial court properly refused to give an involuntary manslaughter instruction because there was no evidentiary basis upon which the jury reasonably could have acquitted Defendant of second degree murder. Even viewed favorably to Defendant, the evidence shows he acted knowingly in killing Clarence. Defendant's statement to Officer Bishop confirmed that Defendant intentionally hit Clarence in the head with a hammer. The blow was so powerful that it cracked his skull around its entire circumference, and it pushed large fragments of bone into his brain. The claw of the hammer penetrated two inches into Clarence's brain, causing destruction of brain tissue and extensive hemorrhaging. Death would be practically certain to result from such a blow. In sum, Defendant intentionally used a deadly weapon on a vital part of Clarence's body to inflict a fatal injury. These facts are sufficient to permit a finding of intent to kill. *See State v. Craig,* 33 S.W.3d 597, 600 (Mo.App. 2000).

Defendant argues, however, that even if he intentionally killed Clarence, he was entitled to the involuntary manslaughter instruction based on the holding of *State v. Beeler,* 12 S.W.3d 294 (Mo. banc 2000), and its progeny.[5] We find this argument unpersuasive for two reasons.

First, *Beeler* addressed the issue of how to properly instruct the jury when both self defense and involuntary manslaughter are submitted. The Supreme Court overruled prior cases standing for the proposition that "self defense in a homicide matter forecloses the possibility of an instruction on involuntary manslaughter because such an offense requires an accidental act or unintended consequence . . . ." *Id.* at 299. The Supreme Court held that "reckless conduct is not inconsistent with the intentional act of defending one's self, if in doing so one uses unreasonable force." *Id.* The instructions in *Beeler* were erroneous because they permitted the jury to reach inconsistent conclusions:

> The jury was instructed in such a way that it could have decided (1) defendant's shooting of McElroy was done in self-defense and (2) defendant acted recklessly by consciously disregarding a risk that grossly deviated from reasonable behavior. Such conclusions are necessarily inconsistent. One cannot be said to act reasonably, as self-defense requires, and grossly deviate from reasonableness, as is the case with one exhibiting a reckless state of mind, at the same time. Here, it is apparent the jury was not properly instructed. . . . The court instructed the jury in such a way that it could have found defendant acted reasonably and unreasonably at the same time.

5. These cases include *State v. Frost,* 49 S.W.3d 212 (Mo.App.2001); *State v. Craig,* 33 S.W.3d 597 (Mo.App.2000); *State v. Battle,* 32 S.W.3d 193 (Mo.App.2000); *State v. Davis,* 26 S.W.3d 329 (Mo.App.2000); and *State v. Hill,* 17 S.W.3d 157 (Mo.App.2000).

*Id.* at 300. In the case at bar, the statutory defense of justification (i.e., self defense or defense of another) codified in § 563.031 was not submitted to the jury. Thus, the problem that arose in *Beeler* is not present here because the instructions given to the jurors did not permit them to reach inconsistent conclusions.

Second, *Beeler* recognized that "[r]ecklessness resembles knowing conduct in one respect in that it involves awareness, but it is an awareness of risk, that is, probability less than a substantial certainty. By contrast, to act knowingly is to be aware that the conduct is practically certain to cause a result." *Id.* at 299. Thus, jurors can draw an inference of recklessness if there is a basis to believe that the defendant "did not knowingly cause the victim's death or have a purpose to do great harm to the victim." *Id.* at 300. In the case at bar, those are the only reasonable and logical inferences that could be drawn from the evidence. By striking Clarence in the head with the claw end of a hammer, Defendant either knowingly caused Clarence's death or had a purpose to do great harm to Clarence. Both transcend recklessness and constitute knowing action. It also is appropriate to note the jury did find Defendant knew or was aware his conduct in striking Clarence with a hammer was causing or was practically certain to cause Clarence's death. The jury had to make this finding beyond a reasonable doubt in order to return its unanimous guilty verdict on the lesser-included offense of voluntary manslaughter. Thus, *Beeler* and its progeny lend no support to Defendant's argument that he was entitled to an involuntary manslaughter instruction.

No rational juror could reasonably conclude that Defendant did not act knowingly in killing Clarence. *See Deckard,* 18 S.W.3d at 504. Since there was no basis for the jury to acquit Defendant of second degree murder, the trial court did not err in refusing Instructions A and C. Defendant's first point is denied.

*Point II*

Defendant's second point posits trial court error in denying his motion to suppress the statements Defendant made to Officer Bishop and Officer Spaeth at the scene and in admitting the statements as evidence at trial. The pretrial motion to suppress alleged that Defendant's statements were inadmissible because they were obtained in violation of Defendant's Fifth Amendment right to remain silent, in that he had not yet been given his *Miranda* warning. The court held an evidentiary hearing at which Officers Bishop and Spaeth testified. After considering the evidence, the trial court determined both statements were admissible and denied the motion. The court later overruled the same constitutional objection to the admission of this testimony during the trial.

 In reviewing a trial court's ruling on a motion to suppress, our inquiry is limited to determining whether the decision is supported by substantial evidence. *State v. Edwards,* 116 S.W.3d 511, 530 (Mo. banc 2003). The evidence presented on the motion to suppress is viewed in a light most favorable to the ruling. *State v. Williams,* 97 S.W.3d 462, 469 (Mo. banc 2003). Therefore, we consider only the facts and reasonable inferences derived therefrom favorable to the ruling. *State v. Galazin,* 58 S.W.3d 500, 507 (Mo. banc 2001). Evidence and inferences contrary to the trial court's order are disregarded. *State v. Kinkead,* 983 S.W.2d 518, 519 (Mo. banc 1998). We defer to the trial court's factual findings and credibility determinations, but we review questions of law *de novo. State v. Rousan,* 961 S.W.2d 831, 845 (Mo. banc 1998). We will not reverse the trial court's ruling on a motion to

suppress unless the decision is clearly erroneous, leaving this court with a definite and firm impression that a mistake has been made. *Williams*, 97 S.W.3d at 469; *State v. Birmingham*, 132 S.W.3d 318, 321 (Mo.App.2004). Viewed in a light most favorable to the trial court's order denying Defendant's motion to suppress, the circumstances under which Defendant made his statements to Officer Bishop and Officer Spaeth are set forth below.

Police arrived at the Winters' home at 5:18 p.m. and secured the premises. All of the officers at the scene were told that: (1) two persons in the house had been assaulted; (2) Defendant may have committed the assaults; and (3) he left in a van. Officer Bishop was assigned to perimeter security. His job was to make sure only authorized personnel like police officers, medical examiners, etc., came inside the yellow police tape that had been placed around the crime scene. While Officer Bishop was performing this duty, he came into contact with several members of the Winters' family. They were very upset and wanted to go inside the house and see what had happened. Officer Bishop prohibited them from going inside the crime-scene tape and directed them to the hospital where the victims were taken.

At 6:04 p.m., a van pulled up to the crime scene and stopped in front of the Winters' house. This was unusual because unauthorized persons are not permitted at a crime scene. During the 20 minutes Officer Bishop had been working perimeter security, all of the other vehicles on the street had passed by the Winters' house without stopping. Officer Bishop approached the van to see why it had stopped. He thought it might be another family member who wanted to look at the crime scene. Officer Bishop opened the van door and asked the driver if he knew anything about what was going on inside

the house. The driver replied "that he came out of the bathroom, that they were trying to rape the baby, so he hit them." At that point, Officer Bishop realized the driver of the van was Defendant. He was asked to exit the vehicle, handcuffed for officer safety and detained for questioning by a detective.

Defendant was taken to Officer Spaeth's patrol car. Officer Bishop placed Defendant in the vehicle and gave Officer Spaeth the Defendant's driver's license. Officer Spaeth asked Defendant if the address shown on the license was correct, and Defendant said it was. Officer Spaeth then ran a computer check to see if there were any "wants or warrants" on Defendant. After Defendant had been in the car 5–10 minutes, he asked if he could talk to somebody. Officer Spaeth replied that Defendant could talk to a detective. Defendant said he would like to do so and asked to be taken to police headquarters for that purpose. Defendant was then transported to police headquarters as he requested. On the way to headquarters, Defendant voluntarily stated that when he came out of the bathroom, Bill was trying to rape Lena. This statement was not made in response to any questioning by Officer Spaeth.

At the conclusion of the suppression hearing, the trial court decided Defendant's statement to Officer Bishop was a spontaneous, unsolicited remark that Defendant made freely, knowingly and voluntarily in response to a single investigative question at the scene. The court also decided Defendant's statement to Officer Spaeth was admissible. The court found this statement was volunteered since it was not made in response to any questioning by Officer Spaeth.

■ We first address the statement Defendant made to Officer Bishop. Defendant argues the statement is inadmissible because it was made in response to custo-

dial interrogation by Officer Bishop before Defendant had been given his *Miranda* warning. Defendant's argument is based on the premise that he was "in custody" when questioned by Officer Bishop because Defendant was suspected of committing the assaults on Clarence and Bill. We disagree.

A *Miranda* warning is not required every time the police question an individual. *State v. Glass,* 136 S.W.3d 496, 510 (Mo. banc 2004). This warning is only required to be given prior to any custodial interrogation of a criminal suspect. *State v. Dravenstott,* 138 S.W.3d 186, 195 (Mo. App.2004). "A custodial interrogation occurs only when the suspect is formally arrested or is subject to arrest-like restraints." *Glass,* 136 S.W.3d at 508. It is well-settled law that a person who is asked preliminary, investigative questions by police is not in custody. *See, e.g., State v. Kerr,* 114 S.W.3d 459, 462 (Mo.App.2003); *State v. Londagin,* 102 S.W.3d 46, 51 (Mo. App.2003); *State v. Barrett,* 41 S.W.3d 561, 565 (Mo.App.2001); *State v. Hicklin,* 969 S.W.2d 303, 310 (Mo.App.1998); *State v. Dye,* 946 S.W.2d 783, 786 (Mo.App.1997); *State v. Norton,* 904 S.W.2d 265, 271–72 (Mo.App.1995); *State v. Crane,* 841 S.W.2d 271, 273 (Mo.App.1992). Here, the trial court found that Defendant's statement to Officer Bishop was spontaneously and voluntarily made in response to a single investigative question at the crime scene. This finding is supported by substantial evidence. Since Defendant was not in custody when he made the statement, he did not have to be informed of his *Miranda* rights before being questioned by Officer Bishop. Therefore, the trial court did not err in denying the motion to suppress and admitting Officer Bishop's testimony at trial.

We next consider the trial court's rulings with respect to the statement Defendant made to Officer Spaeth. We conclude the trial court properly denied the motion to suppress and admitted this evidence at trial because the statement was volunteered. "The *Miranda* safeguards apply whenever a person in custody is subjected to either express questioning or its functional equivalent, i.e., interrogation." *State v. Mitchell,* 41 S.W.3d 574, 578 (Mo.App.2001). Since volunteered statements do not result from custodial interrogation, such statements are not barred by the Fifth Amendment and are admissible even though the person is in custody and has not been given his or her *Miranda* warning. *See, e.g., Gregg v. State,* 446 S.W.2d 630, 632 (Mo.1969); *State v. Elmore,* 43 S.W.3d 421, 425 (Mo. App.2001); *State v. Duncan,* 945 S.W.2d 643, 648 (Mo.App.1997); *State v. Butler,* 660 S.W.2d 225, 228 (Mo.App.1983).

Defendant argues that, even if his statement to Officer Spaeth was volunteered, it should have been suppressed anyway because it resulted from Officer Bishop's earlier, improper interrogation. Our holding that Defendant was not unconstitutionally interrogated by Officer Bishop renders this argument moot. Since the statement to Officer Spaeth was not tainted, "no intervening event was required to attenuate the taint." *Glass,* 136 S.W.3d at 508. Defendant's second point is denied.

The judgment of the trial court is affirmed.

PARRISH, P.J., and SHRUM, J. Concur.