STATE of Missouri, Respondent,

v.

Justin J. LOWE, Appellant.

No. WD 70744.

Missouri Court of Appeals, Western District.

Sept. 7, 2010.

---

Susan E. Summers, Assistant Appellate Defender, Kansas City, MO, for Appellant.

Chris Koster, Attorney General, Richard A. Starnes, Assistant Attorney General, Jefferson City, MO, for Respondent.

Before Division I: KAREN KING MITCHELL, Presiding Judge, LISA WHITE HARDWICK, Chief Judge, and CYNTHIA L. MARTIN, Judge.

KAREN KING MITCHELL, Presiding Judge.

This is an appeal from a judgment of conviction following a jury trial in the Circuit Court of Jackson County ("trial court"). Appellant Justin J. Lowe was convicted of voluntary manslaughter, robbery in the first degree, and two counts of armed criminal action. We affirm.

## Factual and Procedural Background[1]

On or about December 23 or 24, 2006, Justin Lowe arrived at the house that his mother ("Mother") and grandfather ("Grandfather") shared in south Kansas City. Lowe wanted to take a van that he owned and kept at Mother's house to Iowa to see his girlfriend ("Girlfriend") and his daughter and to spend Christmas with them. Mother did not want Lowe to take his van to Iowa because, among other reasons, Lowe's van had expired tags, Lowe had a suspended driver's license, and the van was uninsured. Mother, therefore, would not give Lowe the keys to his van. This greatly upset Lowe, and he argued with Mother for most of Christmas day. Finally, on Christmas evening, Mother tired of arguing with Lowe about the van and gave Lowe the keys. Lowe planned to drive the van to Iowa the next day. Lowe did not know that, before giving him the keys, Mother had done something to the ignition fuse so that the van would not start.

Mother testified that on the morning of December 26, 2006, Lowe seemed to be in a better mood. Mother left the house to run some errands, came home for lunch, and then went to one of her jobs to clean a swimming pool. After she finished with the pool, Mother ran another errand. While she was out, she called home to ask someone to take something out of the freezer for dinner. Lowe answered the phone and told Mother that Grandfather had gone to the store. Mother suspected that Lowe had sent Grandfather to the store so that Grandfather would have to move his car, which had been parked behind Lowe's van.

When Mother returned home at approximately 1:00 p.m., she noticed that Grandfather's car was gone. Neither Grandfather nor Lowe appeared to be at home. Mother assumed that Grandfather had taken Lowe to Iowa. This upset Mother a bit, and she called her sister to discuss this with her. At some point, Mother noticed Grandfather's coat hanging on a chair in the kitchen. Mother did not think that Grandfather would have left the house without his coat, so Mother began looking around for Grandfather again. After she had looked everywhere else in the house, Mother went to the garage and looked inside Lowe's van. In the van she found Grandfather lying with his shirt pulled up over his head. Mother called 911 and went to a neighbor's house for help.

The neighbor returned to the house with Mother and looked for a pulse on Grandfather. The neighbor found none and noted that Grandfather did not appear to be breathing. The police and ambulance arrived at the house, and Grandfather was pronounced dead at the scene. A hammer was found partially under Grandfather's body. Some rubber tubing had been wrapped around Grandfather's body.

Mother called Girlfriend in Iowa and left her a message that Lowe was probably on his way there. Lowe did arrive at Girlfriend's home in Coralville, Iowa, and Girlfriend met Lowe outside. Girlfriend saw Grandfather's car and asked Lowe where Grandfather was. Lowe responded that he had "knocked him out." Police arrived at Girlfriend's house about three minutes after Lowe had arrived. Lowe ran from the scene and was picked up by police a few blocks away. Police found a credit card and car keys belonging to Grandfa-

---

1. In this case, because Lowe claims that the trial court erred in failing to offer an instruction on a lesser included offense, we recite the facts and review the evidence in the light most favorable to Lowe, the defendant below. *State v. Battle*, 32 S.W.3d 193, 195 (Mo.App. E.D.2000).

ther in Lowe's pockets. Lowe was arrested and taken to the police department.

While Lowe was at the police department, he called Girlfriend who then told Lowe that Grandfather was dead. Lowe cried hysterically when he heard that Grandfather was dead. Girlfriend asked Lowe what he had been thinking and Lowe responded that "he wasn't."

At trial the medical examiner testified that during an autopsy he found a number of injuries to Grandfather's body. Among these were two fairly dramatic injuries to the right side of Grandfather's head. The first of these was a laceration in the temple area in front of the right ear measuring two and three-quarters inches in length and two and one-quarter inches in depth. This injury produced a depressed skull fracture, in which bone was pushed inward damaging the underlying brain tissue. A second laceration, measuring one and one-quarter inch in length, was found behind the right ear. It extended into the temporomandibular joint, where the jaw connects to the base of the skull. The autopsy also revealed contusions and hemorrhaging at the base of the neck, indicating blunt force trauma to the right side of the neck, as well as several acute abrasions, bruises, and laceration-type injuries to the right shoulder consistent with blunt force trauma. The medical examiner testified that these injuries, which were in close proximity to the two head injuries, were caused by two or three blows to the shoulder. Grandfather's fifth, seventh, and eighth ribs were fractured prior to his death. There were also injuries to Grandfather's right abdominal area. There were also a number of injuries to the left side of Grandfather's body including a black eye, and bruises and abrasions to the lower lip, elbow, and lower extremities. Some of these injuries may have been caused by Grandfather's falling after he was struck.

The medical examiner testified that it was his belief, to a reasonable degree of medical certainty, that the two blows to the head had caused Grandfather's death.

Mother testified that Lowe had many learning problems as a child. Lowe had been removed from kindergarten and placed in a special pre-kindergarten class. Lowe was diagnosed with severe learning disabilities and was placed in special remedial courses throughout his childhood.

Lowe did not testify at trial, so there was no direct evidence as to what happened between Lowe and Grandfather immediately preceding Grandfather's death. However, Timothy Cefarelli, a convicted criminal, testified as to admissions that Lowe allegedly made to him when the two were in jail together. Cefarelli reported that Lowe had admitted hitting "his best friend" three times with a hammer. According to Cefarelli, Lowe told him that Lowe's "friend," with whom he had been living, had been drunk and had started a fight with Lowe, which ended with the hammer blows. Lowe also reportedly told Cefarelli that his friend was still alive when Lowe left the residence for Iowa.

Lowe's trial lawyer requested that the trial court give the jury an instruction on involuntary manslaughter in addition to the instructions it gave on first-degree murder, second-degree murder, and voluntary manslaughter. The trial court refused to give the involuntary manslaughter instruction. The jury convicted Lowe of voluntary manslaughter. Lowe's attorney filed a motion for new trial, again contending that the jury should have been instructed on involuntary manslaughter, and the motion was denied. This appeal follows.

## Standard of Review

"In reviewing whether a trial court erred in failing to instruct the jury

on a lesser-included offense, we review the evidence in a light most favorable to the defendant." *State v. Newberry,* 157 S.W.3d 387, 393 (Mo.App. S.D.2005). A trial court is not required to give an instruction on a lesser included offense unless the defendant requests the instruction and there is a basis for acquittal on the greater offense. § 556.046.2; *State v. Williams,* 313 S.W.3d 656, 658–60 (Mo. banc 2010). "'In order for there to be a basis for an acquittal of the greater offense, there must be some evidence that an essential element of the greater offense is lacking and the element that is lacking must be the basis for acquittal of the greater offense and the conviction of the lesser.'" *State v. Pond,* 131 S.W.3d 792, 794 (Mo. banc 2004) (quoting *State v. Barnard,* 972 S.W.2d 462, 466 (Mo.App. W.D. 1998)). Any doubt as to the propriety of submitting the instruction on a lesser included offense should be resolved in favor of submission of the instruction, leaving it to the jury to decide. *Williams,* 313 S.W.3d at 660; *State v. Thomas,* 161 S.W.3d 377, 380 (Mo. banc 2005). Nevertheless, a lesser included instruction is not required in every case. A defendant is not entitled to an instruction on a lesser included offense unless the instruction is supported by "evidence of *probative value* " and "inferences which *logically flow* from the evidence." *State v. Deckard,* 18 S.W.3d 495, 499 (Mo.App. S.D.2000) (internal quotation marks and citations omitted). A lesser included instruction need not be given unless a reasonable juror could draw inferences from the evidence presented that an essential element of the greater offense has not been established. *Williams,* 313 S.W.3d at 660. Where the issue is whether a necessary mental element of the greater offense has been established, a lesser included instruction need not be given if no rational fact finder could conclude that the defendant acted without the requisite mental state. *State v. Santillan,* 948 S.W.2d 574, 576 (Mo. banc 1997).

## Legal Analysis

The trial court submitted instructions for: first-degree murder, which is when a defendant knowingly causes the death of another person after deliberation or "cool reflection" on the matter, §§ 565.002(3), 565.020.1; *State v. Johnson,* 284 S.W.3d 561, 572 (Mo. banc 2009); second-degree murder, which is when a defendant knowingly causes the death of another person, or, with the purpose of causing serious physical injury, causes the death of another person, § 565.021.1; and voluntary manslaughter, which is when a defendant causes the death of a person under circumstances that would constitute second-degree murder, except that he acts under the influence of sudden passion arising from adequate cause, §§ 565.023.1(1), 565.002(1), 565.002(7). For the purposes of second-degree murder, a defendant acts knowingly when he is aware that his conduct is practically certain to cause death. The jury acquitted Lowe of the murder charges but found him guilty of voluntary manslaughter. Lowe claims that the jury should also have been instructed on involuntary manslaughter. We disagree.

Involuntary manslaughter occurs when a defendant "[r]ecklessly causes the death of another." § 565.024.1(1). The reckless mental state is further defined as when a defendant "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." § 562.016.4. The only difference between the elements of the crime of voluntary manslaughter and that of involun-

tary manslaughter is the defendant's mental state.

▪ Here, to prove voluntary manslaughter, the State could prevail under either of two theories: that, under sudden passion arising from adequate cause, Lowe (1) knowingly caused Grandfather's death; or (2) purposefully caused Grandfather serious physical injury, which resulted in his death. §§ 565.023, 565.021. For Lowe to be entitled to an instruction for involuntary manslaughter, a reasonable juror must be able to infer from the evidence presented that Lowe did not act knowingly or purposefully but that he acted recklessly in causing Grandfather's death.

## I. No rational juror could acquit Lowe of knowingly causing Grandfather's death.

Lowe argues that his low intelligence was evidence that he was not practically certain that his actions would cause Grandfather's death. We disagree.

▪ If "no rational juror could reasonably conclude that the defendant did not act knowingly" based on the evidence presented, an instruction for the lesser included offense of manslaughter need not be given. *State v. Mason,* 272 S.W.3d 257, 262 (Mo.App. W.D.2008). That is, Lowe was entitled to an instruction on involuntary manslaughter *only if* there was sufficient evidence from which a rational jury could have found that Lowe was not aware that his conduct was practically certain to cause Grandfather's death. *Id.*; §§ 565.023, 565.021, 562.016.3(2).

No rational jury could have so found.

### a. Evidence that Lowe acted knowingly

▪ The existence of a mental state required for conviction of a charged offense is often difficult to prove through direct evidence. " 'The mental elements establishing [the offense charged] may be proved by indirect evidence and inferences reasonably drawn from the circumstances surrounding' the offense." *Santillan,* 948 S.W.2d at 576 (quoting *State v. Turner,* 623 S.W.2d 4, 7 (Mo. banc 1981)).

▪ Missouri courts have found the nature of the conduct that led to the victim's death to be evidence of whether the defendant acted knowingly. *See, e.g., Thomas,* 161 S.W.3d at 381; *Mason,* 272 S.W.3d at 261; *Newberry,* 157 S.W.3d at 396. Because a person is presumed to have intended for death to follow from acts that are likely to produce that result, a defendant's intentional use of a deadly weapon on a vital part of a victim's body to inflict a fatal injury transcends recklessness so that no rational fact finder could conclude that he did not act knowingly. *Newberry,* 157 S.W.3d at 395–96. Where death is practically certain to result from the defendant's conduct, the logical inference is that the defendant intended to kill the victim; thus the facts are sufficient to permit a finding of intent to kill. *Id.* at 396.

Here, Lowe admits striking Grandfather in the head with a hammer. The uncontroverted evidence is that Lowe struck Grandfather multiple times on the right side of his head and neck and on the right shoulder. One blow penetrated two and one-quarter inches into Grandfather's brain. This evidence is sufficient to support the conclusion that Lowe acted knowingly in causing Grandfather's death.

### b. Diminished Capacity

▪ Despite the fact that Lowe struck Grandfather multiple times on the right side of his head and neck, and on the right shoulder, and that one blow penetrated two and one-quarter inches into Grandfather's brain, Lowe argues that due to his

low intelligence he was not practically certain that death would result from his actions. Although the defense did not characterize its claim as such, the evidence and theory offered by Lowe appears to be one of diminished capacity. *See State v. Walkup*, 220 S.W.3d 748, 755 (Mo. banc 2007).[2] Evidence of a mental disease or defect may be used to demonstrate that the defendant did not have the culpable mental state that is an essential element of the crime. § 552.015.2(8). Unlike a claim of not guilty by reason of mental disease or defect, the diminished capacity defense contemplates full responsibility, but only for a lesser crime. Diminished capacity is not an affirmative defense for which the defendant bears the burden of proof, but simply involves the presentation of evidence sufficient to allow a reasonable juror to conclude that an element of the offense charged was negated. *Walkup*, 220 S.W.3d at 754–55.

> In order to prevail on a diminished capacity defense, a defendant must introduce evidence that he or she suffered from a mental disease or defect.... But, the existence of a mental disease or defect will not alone suffice to diminish the defendant's criminal responsibility. The jury must still determine, considering all the evidence, whether the mental disease or defect prevented the defen-

dant from forming the requisite mental state....

*Nicklasson v. State*, 105 S.W.3d 482, 484–85 (Mo. banc 2003) (citations omitted). "The existence of a mental disease or defect not connected to the formation of an intent or existence of a relevant state of mind, does not require the submission of a lesser included offense." *State v. Thompson*, 695 S.W.2d 154, 161 (Mo.App. S.D. 1985).

### 1. Evidence of Lowe's learning disabilities did not negate the "knowing" element of voluntary manslaughter.

Lowe attempted to put on evidence of a mental disease or defect through the cross-examination testimony of Mother. Mother testified that Lowe had learning difficulties throughout his school years—that he was put in a special pre-kindergarten class rather than regular kindergarten. She also testified that Lowe continued with special remedial classes through high school and that he had been diagnosed with severe learning disabilities. However, there was no testimony regarding the nature of Lowe's learning disability or how his difficulties in school affected his ability to function in other settings. Contrary to the assertion in his brief to this court, there was no evidence presented at trial that Lowe had "low intelligence," as there was no evidence that learning disabilities always reflect upon an individual's IQ.[3] No

---

**2.** We have found no case where a defendant argued that the trial court should have given an instruction for a lesser included offense based on the allegation that the defendant's mental deficiency negated an element otherwise supported by the evidence without there being an allegation of diminished capacity. We note that normally when a defendant presents evidence of diminished capacity, the diminished-capacity instruction, MAI–CR3d 308.03, is requested and given. It is not clear that Lowe met the procedural requirements for asserting diminished capacity, but we need not reach that issue to resolve this case because we conclude that the evidence upon

which Lowe relies does not negate the mental element of voluntary manslaughter.

**3.** During the sentencing phase of the trial, a licensed clinical social worker testified on Lowe's behalf. The social worker testified that Lowe had "borderline intellectual functioning," that he had attention deficit disorder, and that his IQ and his learning abilities caused him to function in "the eighth percentile of intellectual functioning." This evidence was not before the jury during the guilt phase, however.

expert testimony was offered. In short, there is no evidence in the record connecting Lowe's difficulty in school to an inability to understand the consequences of striking someone in the head with a hammer. Therefore, there was insufficient evidence connecting Lowe's learning disabilities to the existence of the relevant state of mind, and the evidence does not support the submission of an instruction for the lesser included offense of involuntary manslaughter.

Evidence that Lowe had learning disabilities, without evidence that reasonably connects the learning disabilities to Lowe's inability to understand the likely result of his conduct, does not negate the reasonable inference that Lowe was practically certain that death would result from striking Grandfather in the head with a hammer and thus did not require the submission of the lesser included offense of involuntary manslaughter based on diminished capacity.

### 2. Other evidence cited by Lowe does not negate the "knowing" element of voluntary manslaughter.

Other than Mother's testimony that Lowe had some sort of learning disability that affected his performance in school, the only evidence upon which Lowe relies relates to his conduct after the attack on Grandfather. According to Girlfriend's testimony, Lowe told her that he had "knocked out" Grandfather. Girlfriend also testified that Lowe cried "hysterically" when she told him that Grandfather was dead. Lowe argues that his statement and actions are evidence that he was not practically certain that his actions would result in Grandfather's death.

 Generally, where the nature of the defendant's attack on the victim is such that it only supports the inference that he intended to kill or seriously injure the victim, the fact that the defendant denies an intention to kill is not sufficient to require an instruction for a lesser degree of the offense charged because the statements of defendant are so unreasonable and inconsistent with physical facts and the conduct of the defendant that they do not support a finding of recklessness. *Deckard,* 18 S.W.3d at 503; *see also Mason,* 272 S.W.3d at 261. Similarly, Lowe's telling Girlfriend that he had "knocked out" Grandfather and his being upset when she confronted him with the fact that Grandfather was dead are not sufficient evidence for a rational juror to conclude that, despite the fact that Lowe repeatedly struck Grandfather with a hammer about the head and upper body and left him wrapped in tubing in the back of a van (making it more difficult for him to seek help and less likely that he would be found in time to be helped if he did not die immediately as a result of his injuries), Lowe did not knowingly kill Grandfather.

In addition, Lowe argues that his failure to take adequate steps to conceal evidence at the scene and the fact that he fled to a place where he was likely to be found are evidence that would support the giving of the lesser included instruction. However, Lowe did take steps to conceal his crime. After the attack he took a shower. Girlfriend testified that upon his arrival at her home in Iowa, he told her that "he needed to dump [Grandfather's] car." When the police arrived at Girlfriend's home, Lowe fled. From this evidence a reasonable juror could only conclude that Lowe was conscious of his guilt. Therefore, for Lowe's argument to succeed, we must accept that it would be reasonable for a juror to conclude from this evidence that because Lowe did not take all steps that he could have to conceal his crime or his whereabouts, he understood he had engaged in criminal conduct but did not un-

derstand the likely results of his conduct. This is not a reasonable inference from the evidence presented.

Lowe's conduct after he attacked Grandfather, standing alone, is not sufficient to support the giving of the instruction for the lesser included offense of involuntary manslaughter. Nor is this evidence sufficient to connect the alleged mental defect to the mental state required to support a conviction for voluntary manslaughter so as to negate an element of the greater offense.

■■■ Mere argument that the defendant lacked the required mental state is insufficient "when the physical facts and the defendant's conduct renders such [argument] unreasonable and inconsistent with common experience." *State v. Stidman*, 259 S.W.3d 96, 104 (Mo.App. S.D. 2008). Here, it is unreasonable and inconsistent with common experience to suggest that Lowe was not practically certain that Grandfather's death would result from striking him twice in the head with a hammer with sufficient force to create a two-and-one-quarter-inch indentation in Grandfather's brain. *Cf. Newberry*, 157 S.W.3d at 395–96 (holding that the trial court did not err in refusing to instruct on the lesser included offense of involuntary manslaughter where the defendant struck the victim once in the head with the claw end of a hammer and the hammer penetrated two inches into the brain); *Mason*, 272 S.W.3d at 261 (holding that the fact that the defendant stabbed the victim twice in the back and once each in the neck and shoulder

with enough force to bend the knife and severely injure several internal organs would not support an instruction for involuntary manslaughter); *State v. Hamlett*, 756 S.W.2d 197, 200–01 (Mo.App. S.D. 1988)[4] (holding that an instruction on the lesser included offense of involuntary manslaughter was properly refused where victim died of a massive brain hemorrhage because blows to the head by fist and feet were a means likely to produce death).

We are mindful that our Supreme Court has made it clear that a lesser included instruction is warranted when evidence supports differing conclusions as to the defendant's mental state. *Santillan*, 948 S.W.2d at 576. But this does not mean that *any* evidence, no matter how limited or lacking in probative value, will support the giving of an instruction on a lesser included offense. Nor does this standard eliminate the need to connect evidence of a mental defect to the mental state that the evidence is offered to negate. Further, our Supreme Court continues to apply the reasonable juror standard, requiring that an instruction be given for a lesser included offense only "[i]f a reasonable juror could draw inferences from the evidence presented that an essential element of the greater offense has not been established." *Williams*, 313 S.W.3d at 660; *see also Santillan*, 948 S.W.2d at 576. As explained, no reasonable juror could conclude from the evidence in this case that Lowe was not practically certain that his actions would result in Grandfather's death, and therefore Lowe was not entitled to a lesser

4. In finding that the attack at issue in *Hamlett* was not reckless and thus the defendant was not entitled to an instruction for involuntary manslaughter, the *Hamlett* court noted that the attack was "deliberate, not accidental." 756 S.W.2d at 200–01. In *State v. Beeler*, 12 S.W.3d 294, 299 (Mo. banc 2000), the Supreme Court rejected the proposition that recklessness requires accidental or culpably negligent conduct. While some of the *Hamlett* court's reasoning may no longer be valid after *Beeler*, the ultimate conclusion that Hamlett's assault on the victim "by fists and feet, was a means likely to produce death, [and thus] Hamlett [was] presumed to have intended that death would follow his acts," appears to remain good law. 756 S.W.2d at 201.

included offense instruction. *Williams,* 313 S.W.3d at 660.

## II. No rational juror could conclude that Lowe did not purposefully cause Grandfather serious physical injury.

■ Lowe's arguments are also unavailing because the evidence he cites suggests that Lowe purposefully caused Grandfather serious physical injury that led to his death. The intent to kill or to *seriously injure* the victim is sufficient to support conviction of the greater offense of second-degree murder or voluntary manslaughter. *See Newberry,* 157 S.W.3d at 397; § 565.021.1(1) ("A person commits the crime of murder in the second degree if he ... with the purpose of causing serious physical injury to another person, causes the death of another person."); § 565.023.1(1) ("A person commits the crime of voluntary manslaughter if he ... [c]auses the death of another person under circumstances that would constitute murder in the second degree ... except that he caused the death under the influence of sudden passion arising from adequate cause."). The statement to Girlfriend that he "knocked out" Grandfather and the fact that Lowe partially tied Grandfather up supports the finding that Lowe intended to *seriously injure* Grandfather. *See Newberry,* 157 S.W.3d at 397. By stating that he had "knocked out" Grandfather, Lowe acknowledged that, in striking Grandfather over the head with a hammer, it was his purpose to knock him unconscious, and therefore to cause serious physical injury to him, which is an element of voluntary manslaughter and is not an element of involuntary manslaughter. §§ 565.021, 565.023, 565.024. Therefore, such evidence did not necessitate an instruction based on involuntary manslaughter. § 556.046.2.

## Conclusion

No reasonable juror could find that Lowe was not aware that Grandfather's death was practically certain to result from Lowe's striking him, at least twice, in the head with a hammer. In addition, no reasonable juror could find that Lowe did not purposefully cause Grandfather serious physical injury, which led to his death, when he hit Grandfather in the head with a hammer for the purpose of knocking him unconscious and then left him restrained in a van inside a garage where it was unlikely that he would be able to seek help or would be found in a timely fashion. Accordingly, we hold that the trial court did not err in refusing to give the jury an instruction on the offense of involuntary manslaughter. We therefore affirm the judgment of the trial court.

LISA WHITE HARDWICK, Chief Judge, and CYNTHIA L. MARTIN, Judge, concur.